1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF CONNECTICUT

 3  DANIEL G. MALCHMAN          :  3:01CV01877 (MRK)

 4  VS.                         :  AT HARTFORD

 5  CITY OF NORWICH             :  FRIDAY

 6                              :  APRIL 9, 2004

 7  DEPOSITION OF:  DANIEL G. MALCHMAN

 8  APPEARANCES:

 9  LAW OFFICES OF WILLIAMS & PATTIS, LLC

 9       Attorneys for the Plaintiff

10       51 Elm Street

10       Suite 409

11       New Haven, CT  06510

11       (203) 562-9931

12  BY:  TIMOTHY J. MAHONEY, ESQ.

12

13  LAW OFFICES OF HOWD & LUDORF

13       Attorneys for the Defendant

14       65 Wethersfield Avenue

14       Hartford, CT  06114-1190

15       (860) 249-1361

15  BY:  JOHN J. RADSHAW, III, ESQ.

16

17

18

19

20
```

Exhibit A

2

1   Deposition of DANIEL G. MALCHMAN, a witness, taken on

2   behalf of the DEFENDANT, CITY OF NORWICH, in the herein

3   before entitled action, pursuant to the Federal Rules of

4   Civil Procedure, before Heather A. Pellerin, duly qualified

5   Notary Public in and for the State of Connecticut and

6   Commonwealth of Massachusetts, held at the LAW OFFICES OF

7   HOWD & LUDORF, Attorneys for the Defendant, 65 Wethersfield

8   Avenue, Hartford, CT  06114-1190, (860) 249-1361,

9   commencing at 10:00 a.m. on FRIDAY, APRIL 9, 2004.

10                     STIPULATIONS

11      It is hereby stipulated and agreed by and among

12   counsel for the respective parties that all formalities

13   in connection with the taking place of this deposition,

14   including time, place, sufficiency of notice, and the

15   authority of the officer before whom it is being taken

16   may be and are hereby waived.

17      It is further stipulated and agreed that objections

18   other than as to form are reserved to the time of trial.

19      It is further stipulated that the proof of the

20   qualifications of the Notary Public before whom the

21   deposition is being taken is hereby waived.

22

23

24

25

3

```
 1                          INDEX

 1

 2                    DANIEL G. MALCHMAN

 3  DIRECT         CROSS         REDIRECT        RECROSS

 3     4*

 4  *By Mr. Radshaw

 4  **By Mr. Mahoney

 5  DEFENDANT'S EXHIBITS                          PAGE

 6  Exhibit 1, Renotice of Deposition      (premarked)

 7  Exhibit 2, Complaint                   (premarked)

 8  Exhibit 3, Responses to Interrogatories     (premarked)

 9  Exhibit 4, May 13th, 1999 Document           50

10

11

12

13

14

15

16

17

18

19

20

21

22

23

25
```

4

1  DANIEL G. MALCHMAN, called as a witness by the defendant,

2  having first been duly sworn by the Notary, was examined

3  and testified on his oath as follows:

4

5          MR. RADSHAW:  Usual stips?

6          MR. MAHONEY:  Yes, read and sign.

7

8      DIRECT EXAMINATION BY MR. RADSHAW:

9

10     Q.   Good morning, Mr. Malchman.

11     A.   Good morning.

12     Q.   My name is John Radshaw, and I am an attorney

13  here at Howd and Ludorf, and I represent the City of

14  Norwich in a lawsuit that you have brought against it, and

15  I want to go over a couple of ground rules.  Have you ever

16  had your deposition taken before?

17     A.   Yes.

18     Q.   Okay.  About how many times have you had it

19  taken?

20     A.   I think once.

21     Q.   Okay.  How long ago was that?

22     A.   Seven or eight years ago, maybe.

23     Q.   And what was that concerning, briefly?

24     A.   Somebody hit me in the back.

25     Q.   So it was as a result of a motor vehicle

1     Q.   And there is no relation.

2     A.   I know that, I already heard them.  I was

3  laughing when I came in, no offense.

4     Q.   And tell me -- I'm sorry I interrupted you.

5  Please continue.

6     A.   The reason I haven't filed the suit yet against

7  Mr. Bogdanski is that I'm in the middle of an in-depth

8  court trial --

9          MR. MAHONEY:  Remember, we're talking about this

10         lawsuit.

11         THE WITNESS:  But it all pertains to this

12         lawsuit.  It's all part.  It's all one scope.  There

13         will be more suits brought forthcoming.

14         MR. MAHONEY:  I understand.

15         THE WITNESS:  See, I'm not allowed to bring

16         anything, according to the court, against any of the

17         witnesses in the case, so I have to wait for the case

18         to be resolved, and when the case is resolved I will

19         go forth with my other suits.

20    Q.   (By Mr. Radshaw) As I understand, there is at

21 least one criminal charge against you that has to do with

22 illegal dumping?

23    A.   I didn't own the building, had nothing to do

24 with it.

25    Q.   I understand that, but as I understand it -- let

11

1   me ask the question.  As I understand it, the state is

2   accusing you of illegal dumping of something?

3       A.   That is correct.

4       Q.   And what are they accusing you of dumping

5   illegally?

6       A.   Okay.  I bought a building -- let me shut my

7   phone off because that's very rude.  Let me shut my phone

8   off.  I apologize.

9       Q.   No problem.  You have more than one?

10      A.   Yes.  I apologize.

11      Q.   I'm only interested in what are you accused of

12  dumping illegally.

13      A.   I have to explain it.

14      Q.   I will give you an opportunity to explain it.

15      A.   Sand grit, sand.

16      Q.   And was that allegedly contaminated with

17  something?

18      A.   Supposedly, yes.

19      Q.   And what was that allegedly contaminated with?

20      A.   Paint.

21      Q.   And that was lead paint?

22      A.   Correct.

23      Q.   And how is it that -- withdraw that.  And how is

24  it that Bogdanski fits into the illegal dumping, the

25  alleged illegal dumping of sand?

1       A.   I can't tell you that because I don't understand

2   what that means.

3       Q.   Let's start with if there were more than one

4   defendant, you would refer to them as defendants; is that

5   correct?

6       A.   Correct.

7       Q.   So if someone wanted to refer to a multiplicity

8   of defendants, there would be an "s" somewhere in the

9   complaint if this lawsuit was addressed to multiple

10  defendants; isn't that right?  I mean, if you don't know

11  the answer, you don't know.

12          MR. MAHONEY:  Do you understand the question?

13          THE WITNESS:  I think so.  I had my attorney do

14      this.

15      Q.   (By Mr. Radshaw) Let me ask you a better

16  question.  Do you believe that as a result of this lawsuit

17  you have sued Robert Aldi?

18      A.   No.

19      Q.   Okay.

20      A.   No.

21      Q.   All right.  So we talked about the failure to

22  protect you from criminal conduct.  You were telling me

23  briefly about Robert Aldi allegedly giving information to

24  the state's investigator.  Other than those two incidents,

25  and I will go back to them, are there any other bases for

20

1   that.

2        A.   The police reports.

3        Q.   Okay.  Let's start with paragraph 6, paragraph 6

4   of Defendant's Exhibit 2.  You allege that on the night of

5   October 31st through November 1st, 1996, at your residence

6   on Tanglewood Drive, your automobile was spray painted with

7   a swastika; is that correct?

8        A.   Swastikas, many.

9        Q.   How many were there?

10       A.   Four or five.

11       Q.   And you also allege that you reported this hate

12  crime to the Norwich PD?

13       A.   Yes, I did.

14       Q.   And you provided investigating officers with the

15  name of the most likely perpetrator; is that right?

16       A.   Which I thought at that time, right.

17       Q.   And then the last sentence here is, "Although

18  the police pretended to investigate the crime they, in

19  fact, conducted no investigation of the chief suspect

20  because of his connections to Robert Aldi, at that time a

21  prominent member of the Norwich PD."  Is that right?

22       A.   That is correct.

23       Q.   Let's take that sentence right there.  What

24  evidence do you have that the police pretended to

25  investigate the crime?

1          A.    Well, I spoke with now, his name is lieutenant,

2    captain, I think he's lieutenant, Lieutenant Rusty Ward at

3    a later date, and he told me that they dropped the ball on

4    the case.  In fact, he did it in front of the city manager

5    in Norwich within the last six months, that was one thing.

6          Q.    What is this guy's name?

7          A.    Captain or lieutenant, I think he's lieutenant

8    now, Lieutenant Rusty Ward, in a meeting, because there was

9    another incident that happened with the fire department,

10   which there will be another case coming up shortly.

11         Q.    Okay.

12         A.    Okay.

13         Q.    What did Rusty Ward say to you that made you

14   think that the -- let me ask you a question, when was this

15   written?

16         A.    When was this written?

17         Q.    Yeah, Defendant's Exhibit 2?

18         A.    It says here October 1st, 2001.

19         Q.    What evidence did you have on or about

20   October 1st, 2001, that the police pretended to investigate

21   the hate crime incident with the spray painting of

22   swastikas?

23         A.    They never went and talked to --

24         Q.    No, no, what evidence do you have?

25         A.    Evidence?

22

 1      Q.   Yes.

 2      A.   In speaking to Captain Aldi on about 20

 3 occasions and talking to him, he kept telling me that the

 4 investigation was going on and little to no -- after he got

 5 out of the police department, I went in and had a

 6 conversation with Rusty Ward, that it wasn't, and just

 7 within the last year they sent detectives out again on the

 8 same case, questioning neighbors.

 9      Q.   Now, do you have any training in law

10 enforcement?

11      A.   No.

12      Q.   And I was going to say you probably don't

13 have -- you can't be in all places at all times; is that

14 right?

15      A.   No, nobody is.

16      Q.   Okay.  And this is the incident that occurred

17 sometime on the night of October 31st; isn't that right?

18      A.   If that's the date that's down, that's correct.

19      Q.   Do you know if -- now, when you called the

20 police, did the police come out?

21      A.   Yes, they did.

22      Q.   Okay.  And do you know if a report was

23 generated?

24      A.   Yes, but it was not turned in to the State of

25 Connecticut.  It was not followed through.

23

1     Q.   Okay.  Answer my question.  Do you know whether

2 or not a report was generated by a member of the City of

3 Norwich Police Department concerning the crime that

4 allegedly occurred --

5     A.   Yes.

6     Q.   -- on the night of October 31st, 1996?

7     A.   Yes.

8     Q.   Okay.  And do you know who completed that

9 report?

10     A.   Do I?  If you show me the report.

11     Q.   You don't know, as you sit here today?

12     A.   No, I don't remember, but we must have the

13 report.

14     Q.   Okay.  And were you interviewed by an officer

15 sometime after the swastikas were spray painted on your car

16 back in 1996?

17     A.   It was done that day, that morning.

18     Q.   That would have been the morning of

19 November 1st?

20     A.   That's correct.

21     Q.   Because you called to -- you discovered the

22 swastikas at 6:20 in the morning; is that right?

23     A.   That's right.

24     Q.   But an officer did come out and speak with you

25 about it?

1        A.   In fact, several.

2        Q.   But at least one did?

3        A.   Correct.

4        Q.   And did they take a picture of the graffiti?

5        A.   One picture.

6        Q.   Okay.  Now, do you have any personal knowledge

7   of what the Norwich Police Department or its members may

8   have done other than that activity?

9        A.   Yes.

10       Q.   Okay.  And do you understand what I mean by

11  "personal knowledge"?

12       A.   Yeah, told.

13       Q.   No, no.  Personal knowledge is when you see it

14  or you hear the -- not spoken from someone, but when you

15  personally observe or perceive activities.  That's when I

16  say "personal knowledge."  When someone tells you something

17  that happened somewhere else that you didn't see, that's

18  hearsay.  So, when I ask you this question, and if you

19  don't understand it, ask me to rephrase it.

20       A.   I don't understand it.

21       Q.   For example, because you and I are sitting here

22  speaking you and I will have personal knowledge of what

23  happened this in room.  Why?  Because we can

24  contemporaneously see and hear what happens in this room.

25  However, my colleague in the office across the hall,

1    because she can't hear us through closed doors has -- or

2    does not have personal knowledge of what transpires in here

3    today.  I can go in and tell her about what happened, but

4    she has no personal knowledge of what occurred inside this

5    room.  Okay.  Is that helpful in your understanding of

6    "personal knowledge"?

7         A.   See, I consider it something different.

8         Q.   Let's go with my definition.  Because, for

9    example, would it also be possible that I could go into the

10   other room or in another part of my office building and

11   tell a colleague and totally fabricate a story about what

12   transpires in this room?  Is that fair?

13        A.   Yes.

14        Q.   Is that possible?

15        A.   Yes.

16        Q.   And that colleague, not having personal

17   knowledge of what occurred in this room, couldn't be sure

18   necessarily what I would be telling him is true or not,

19   because he did not contemporaneously perceive it through

20   his sight and his own hearing.  You understand?

21        A.   Now I do.  Okay.

22        Q.   So, getting back to the incident when the

23   officers came out on November 1st, they interviewed you,

24   they took a photograph, do you have personal knowledge of

25   what other things were done by the Norwich Police?

26

1      A.   No.

2      Q.   Okay.  Because you weren't riding around with

3  the Norwich Police on that day or any other day after?

4      A.   Uh-hmm.

5      Q.   Is that correct?

6      A.   That's correct.

7      Q.   And for all you know they may or may not have

8  interviewed people concerning this?

9      A.   That's correct.

10     Q.   Okay.  So when you said back in 2001 that the

11  police pretended -- excuse me, that the police conducted no

12  investigation of the chief suspect, you have no personal

13  knowledge that supports that allegation, do you?

14     A.    I should have phrased it a little different

15  because I do have knowledge from captain -- Lieutenant

16  Rusty Ward.

17     Q.   But that knowledge you only received recently;

18  is that right?

19     A.   That's correct.

20     Q.   And that's totally based on what Mr. Ward said

21  to you; is that right?

22     A.   That's correct.

23     Q.   Mr. Ward could have lied to you, couldn't he

24  have?

25     A.   I don't think so.

1        Q.    Okay.  But is it possible?

2        A.    No.

3        Q.    So you're telling me that the evidence that the

4    police conducted no investigation whatsoever of this

5    incident is based on what Mr. Ward said to you; is that

6    right?

7        A.    Almost.  They did a little bit.  They didn't

8    follow-up.  They didn't do the hate crime report.

9        Q.    So when it says here that they, in fact,

10   conducted no investigation in paragraph 6, that's wrong; is

11   that correct?

12       A.    That is correct.

13       Q.    Okay.  So that particular statement is not

14   appropriate in this complaint?

15       A.    No.  I disagree.

16       Q.    So --

17             MR. MAHONEY:  You disagree?

18             THE WITNESS:  I disagree with that.

19       Q.    (By Mr. Radshaw) That's fine.

20       A.    Okay.  I disagree.

21       Q.    And what exactly did Mr. Ward say to you?

22       A.    He informed me that in a case like this there

23   should be a document done for the State of Connecticut

24   called a hate crime report.

25       Q.    A hate crime, okay.

1      A.   And that report was not filed.  It was not

2  followed through.

3      Q.   Let's back up.  It's your testimony that a hate

4  crime report was not filed with the State of Connecticut;

5  is that correct?

6      A.   That is correct.

7      Q.   Is it your claim that a hate crime report on

8  state -- State of Connecticut forms was not, in fact,

9  filled out at all?

10     A.   It was not filed.

11     Q.   When you say it's not filed, what do you mean by

12  "not filed"?

13     A.   You have to mail it and file it and send it to

14  the State of Connecticut.

15     Q.   And on what evidence do you have that that

16  report was not filed with the State of Connecticut?

17     A.   Calling the State of Connecticut hate crime

18  unit.

19     Q.   Who did you call?

20     A.   The office.

21     Q.   And do you know who you talked to?

22     A.   No, I don't.

23     Q.   When did you call them?

24     A.   2000 -- 2002.

25     Q.   And so that was in 2002?

```
 1        A.    Uh-hmm.

 2        Q.    So that would have been before -- excuse me,

 3   that would have been after you filed this lawsuit against

 4   the City of Norwich; is that correct?

 5        A.    Uh-hmm, yes, it is.

 6        Q.    And you believe that it's incorrect to say that

 7   Norwich did no investigation, but it's correct that they

 8   just did some investigation, but it was a substandard

 9   investigation; is that correct?

10        A.    Very substandard.

11        Q.    But they did, in fact, investigate?

12        A.    An iota.

13        Q.    Let me ask that question again.  Yes or no,

14   isn't it true that the City of Norwich Police Department

15   investigated that crime, that incident that occurred on the

16   evening of October 31 to the morning of November 1st, back

17   in 1996?

18        A.    Not properly.

19        Q.    Did you understand my question?

20        A.    Yeah.

21        Q.    It was a yes or no question.  So let me ask it

22   again.  Isn't it true that the City of Norwich Police

23   Department investigated the hate crime incident that

24   occurred on the evening, sometime between the evening of

25   October 31st, 1996, and the morning of November 1st, 1996,
```

1  yes or no?

2        A.   Can I ask my attorney a question?

3        Q.   Absolutely.  If you'd like, you can step out.

4  I'd prefer that you not ask any questions while a question

5  is pending.  If you can't -- if you don't understand the

6  question --

7        A.   I understand it, but it's a twofold --

8        Q.   Let me ask you -- I will withdraw that question.

9        A.   Okay.

10       Q.   You understand we have been talking about a hate

11  crime incident that occurred in 1996; is that right?

12       A.   Yes.

13       Q.   And were there any other crime incidents that

14  occurred in 1996?

15       A.   No.

16       Q.   Okay.  So if I were to say the hate crime in

17  1996, you would understand that to mean the incident that

18  occurred sometime either in the evening of October 31st or

19  into the morning of November 1st in the year of 1996 when

20  some unknown parties sprayed swastikas on your vehicle; is

21  that correct?

22       A.   That's correct.

23       Q.   And you understand what I'm saying?

24       A.   Correct.

25       Q.   So if I ask this question, and it's a yes or no

1    question, yes or no, did the Norwich Police Department

2    investigate the 1996 hate crime incident?

3         A.   Yes.

4         Q.   Thank you.  But I understand that you believe

5    that they did not do a proper investigation; is that

6    correct?

7         A.   That is correct.

8         Q.   And it's your belief that it's substandard, that

9    there are other things they should have done; they should

10   have worked harder on it, including, you believe, they

11   should have sent this particular form to a particular

12   office in the State of Connecticut; is that correct?

13        A.   That's correct.

14        Q.   Okay.  Now, turning your attention to

15   paragraph 7 of the plaintiff's complaint, which is

16   Defendant's Exhibit 2, it says that "sometime on the

17   evening of October 31 to November 1, 1997, dog feces were

18   placed in the plaintiff's mailbox."

19        A.   Uh-hmm.

20        Q.   Now, then the last sentence of that paragraph

21   says, "The Norwich Police failed or refused to investigate

22   the incident."  Let's start with how did you discover that

23   there were dog feces in your mailbox?

24        A.   I went out to the mailbox to get my mail and it

25   was full of shit.

32

1     Q.   Got you.

2     A.   Excuse me.

3     Q.   Now, did you see -- let me back up.  Turning

4  back to the hate crime incident in 1996, you didn't see who

5  spray painted the swastikas on your car, did you?

6     A.   No, I did not.

7     Q.   And no member of your family saw who spray

8  painted the swastikas on your car, did they?

9     A.   No, they did not.

10    Q.   And you do not have the names of any person who

11  witnessed the spray painting of the swastikas; is that

12  correct?

13    A.   No, I do not.

14    Q.   Let's go back to the dog feces, and I will ask

15  you the same bunch of questions.  You didn't see who put

16  the dog feces in your mailbox, did you?

17    A.   No, I did not.

18    Q.   And no member of your family saw them?

19    A.   No, they did not.

20    Q.   And you have no information or witnesses that

21  would -- withdraw that.

22         You have no witnesses that saw the dog feces get

23  put in your mailbox; is that correct?

24    A.   No, I did not.

25    Q.   Okay.  After you found the dog feces in your

33

1    mailbox did you call the police?

2         A.   Yes, I did.

3         Q.   And what happened next?

4         A.   I asked the police to please check the feces

5    samples, because Mr. Bogdanski had a big dog, you know, in

6    his backyard, and it was fresh.  I mean, it was a fresh

7    feces.  It was real nasty.

8         Q.   That's terrible.  I'm sorry.

9         A.   And it would not be a hard lab test to check,

10   and according to my reports, it was never done.

11        Q.   Now, let's back up.  Did a police officer come

12   out and speak to you?

13        A.   Yes, he did.

14        Q.   Do you remember who it was?

15        A.   No, I don't.

16        Q.   But an officer did, in fact, come out and speak

17   to you?

18        A.   Absolutely.

19        Q.   And a report was generated concerning this

20   incident; is that correct?

21        A.   That is correct.

22        Q.   And other than his -- that officer's interview

23   of you after the incident occurred in 1997 about the dog

24   feces, you have no personal knowledge of what else that

25   officer or some officer might have or might not have done;

34

1   is that true?

2        A.   Well, I called the department on numerous times

3   speaking to -- captain or lieutenant, Mr. Aldi, I don't

4   know which, asking him to do certain things and check

5   certain things and asking about -- when I got the police

6   report from the police department, it did not show, or it

7   didn't show me that the feces was ever checked like I

8   asked.

9        Q.   So back on paragraph 7, that last sentence where

10  it says, "The Norwich Police failed to investigate this

11  incident," that's not true, is it?

12       A.   They didn't follow-up on it.

13       Q.   But they did, in fact, come out and investigate

14  the incident when they talked to you; is that right?

15       A.   They talked to me.

16       Q.   And they collected as much information as was

17  available; is that right?

18       A.   As much dog feces, yes.

19       Q.   And did they take the dog feces with them?

20       A.   Some.

21       Q.   And it's your claim that because they did not do

22  an analysis of the dog feces that were there in your

23  mailbox with the dog feces that might have been found at

24  Mr. Bogdanski's house, that that was a substandard

25  investigation; is that right?

35

1      A.   Yes, I do believe that.

2      Q.   But you concede they did some investigation?

3      A.   Yes.

4      Q.   It's just that you don't believe that they did

5  enough of an investigation to suit you; is that right?

6      A.   That's correct.

7      Q.   Okay.  Now, in paragraph 8 that goes over to the

8  next page in Defendant's Exhibit 2, you allege that on

9  October 26th, 1998, and again on November 3rd, you received

10  harassing and threatening mail, and you believe this mail

11  to have been sent to you by Bogdanski; is that right?

12      A.   Absolutely.

13      Q.   Okay.  And you reported this hate mail to the

14  police; is that right?

15      A.   That is correct.

16      Q.   And did an officer come out and talk to you?

17      A.   Yes, he did.

18      Q.   And was a report generated, if you have any

19  knowledge of that?

20      A.   Yeah, I think, so.

21      Q.   Okay.  And was the October 26th, 1998 mail

22  signed "love, neighbors"?

23      A.   I don't remember.  There were several of them.

24      Q.   And do you know if the Norwich Police took that

25  letter and took it as evidence?

1        A.    I do not.

2        Q.    And you have no witnesses that would suggest

3   this?

4        A.    I do not.

5        Q.    So your belief is really just supposition and

6   conjecture; is that right?

7        A.    No.  It's not correct.

8        Q.    It's not -- if you have no evidence, it's just

9   your belief?

10       A.    The police didn't follow it up.

11       Q.    So, again, because the police did not

12  investigate Mr. Hoover, that's another example of what you

13  believe to be their substandard investigation?

14       A.    That is correct.

15       Q.    Okay.  All right.  And then, in paragraph 9 of

16  Defendant's Exhibit 2, you allege that you received a

17  letter on April 12th, 1999 that says no one forgets; is

18  that correct?

19       A.    That's correct.

20       Q.    And you did, in fact, report this to the Norwich

21  Police?

22       A.    That's correct.

23       Q.    But the Norwich Police came out and investigated

24  that; is that right?

25       A.    That is correct.

41

 1     Q.   And what evidence do you have that the Norwich

 2  Police refused to conduct a handwriting analysis of the

 3  letter received in April of 1999?

 4     A.   Because I asked them also to check on

 5  Mr. Hoover, and again Mr. Hoover was not checked on.

 6     Q.   And that's the only reason why they refused to

 7  do a handwriting examination?  I'm sorry, withdraw that

 8  question.  That didn't make any sense.  My apologies.

 9     A.   No problem.

10     Q.   With regard to the April 12th, 1999 letter, you

11  reported the crime; is that correct?

12     A.   That is correct.

13     Q.   And you requested that Bogdanski's handwriting

14  be compared to that letter; is that correct?

15     A.   That is correct.

16     Q.   But it's your testimony that Norwich Police

17  refused to compare it to Bogdanski's handwriting; is that

18  correct?

19     A.   I did not say that.  I said one of the letters.

20     Q.   Let's read the second sentence in paragraph 9.

21  "When he reported this crime to the Norwich Police and

22  asked that the handwriting be compared to that of

23  Bogdanski, they refused to do so."  Do you see that?

24     A.   That's correct.

25     Q.   And the "he" in that sentence would be you; is

42

1    that correct?

2          A.   If I'm correct, that was the missing letter I

3    asked about.  There was three that were sent to the state

4    forensic lab.

5          Q.   Let me just get back to my question, all right?

6          A.   Uh-hmm.

7          Q.   You have paragraph 9 there in front of you?

8          A.   Uh-hmm.

9          Q.   When you say "um-hmm," you mean yes?

10         A.   Yes.

11         Q.   The second sentence says, "When he reported this

12   crime to the Norwich Police and requested that the

13   handwriting be compared to the handwriting of Bogdanski,

14   they refused to do so."  Do you see that sentence?

15         A.   I don't see where he's talking about.

16         Q.   Paragraph 9?

17              MR. MAHONEY:  Starting there.

18              THE WITNESS:  Oh.  "He" must have been me.

19         Q.   (By Mr. Radshaw) That's what I'm asking you.  In

20   the context of the sentence "he" is the plaintiff, Daniel

21   Malchman?

22         A.   That is correct.

23         Q.   The "they" in the sentence is the Norwich

24   Police?

25         A.   That's correct.

1        Q.    And it's your testimony and your allegation that

2   the Norwich Police refused to compare the April 12th, 1999

3   letter to the handwriting of Bogdanski; is that correct?

4        A.    At one point, yes.

5        Q.    And do you know if they were empowered to

6   compare it to Bogdanski's handwriting?

7        A.    Empowered?

8        Q.    Were they able to do so?

9        A.    I don't know if it was done later.

10       Q.    Do you know whether or not Mr. Bogdanski refused

11   to provide any additional handwriting exemplars?

12       A.    He did.

13       Q.    And isn't it true that he refused to provide a

14   handwriting exemplar in connection with the April 12th

15   letter?

16       A.    I do think so.

17       Q.    Do you have any special training or expertise

18   concerning handwriting analysis?

19       A.    No, I do not.

20       Q.    So that would be a subject for an expert or

21   scientist in that field, and that's something that you have

22   no knowledge or experience or training in that area; is

23   that correct?

24       A.    That's why I hire somebody.

25       Q.    So you wouldn't know whether or not in order to

44

1    compare someone's handwriting to determine whether they're

2    not -- they're the author of a document, whether it is

3    necessary for the person to whom you compare is required to

4    write out that letter using the exact same words and the

5    same paper?  Do you know whether or not that's the case?

6         A.   I don't know what you mean.

7         Q.   Do you remember when you gave a handwriting

8    sample to the Norwich Police department?

9         A.   Yes.

10        Q.   Okay.  And isn't it true that when you gave the

11   handwriting sample to the Norwich Police Department, one

12   element of the handwriting sample was for you to write out

13   the exact threatening mail that you received?

14        A.   That is correct.

15        Q.   It seemed kind of strange, didn't it?

16        A.   No.

17        Q.   I mean, it wasn't -- it was strange to you to

18   have to write out these threatening words, wasn't it?

19        A.   No.

20        Q.   But you, in fact, in order to complete the

21   analysis, had to write out the threatening letter; isn't

22   that right?

23        A.   Yes.

24        Q.   So if a new piece of threatening mail came, you

25   would also have to write out that threatening mail,

45

1  wouldn't you?

2       A.   Yes.

3       Q.   Okay.  So for each new piece of threatening

4  mail, all the persons' handwriting to whom that new piece

5  of mail would be compared to would have to submit a new

6  piece of mail, a new exemplar; isn't that true?

7       A.   That's correct.

8       Q.   So Mr. Bogdanski refused to cooperate, and he

9  did not submit an exemplar of the April 12th, 1999 letter,

10 did he?

11      A.   That's what you're saying.

12      Q.   So how could the Norwich Police compare it to

13 Mr. Bogdanski's handwriting if he refused to provide an

14 exemplar?

15      A.   They couldn't.

16      Q.   So, again, you concede that with regard to the

17 April 12th letter, the Norwich Police did some

18 investigation.  They did talk to you.  They did check this

19 particular item for fingerprints, but they didn't do

20 enough; isn't that right?

21      A.   They did not -- again, when I say "again,"

22 Mr. Hoover is there, would you please ask him -- nothing

23 was done.

24      Q.   Okay.  But there's nothing in your complaint

25 that mentions Mr. Hoover, does it?

50

1        A.    Yes.   It was done by Judge Handy from the bench,

2    yup, and a letter to him.

3        Q.    Do you know if there was ever a written order

4    that was reduced to paper as a result of Judge Handy's oral

5    order from the bench?

6        A.    Yes.   There was a letter from the state's

7    attorney's office to Mr. John Bogdanski, uh-hmm, and you

8    have it in your hand.

9            MR. RADSHAW:   Can we mark this as Defendant's

10           Exhibit 4.

11           (Defendant's Exhibit 4, May 13th, 1999 Document,

12           Marked for Identification)

13       Q.   (By Mr. Radshaw) Showing you a document that's

14   been marked Defendant's Exhibit 4, it's the State of

15   Connecticut Department of Criminal Justice addressed to

16   John Bogdanski, and it is signed by what appears to be

17   Tamberlyn -- T-A-M-B-E-R-L-Y-N, Conopask.  Have you seen

18   that letter before?

19       A.   Yes, I have.

20       Q.   And you believe that's the evidence of the

21   existence of the order; is that right?

22       A.   This is not the first order.  There was one

23   before this from the bench orally, also directed by Judge

24   Handy directly to Mr. Bogdanski.

25       Q.   Tell me what the date of that letter is?  It's

51

1    May 13th, isn't that right, 1999?

2          A.    Yes.

3          Q.    And it's your testimony that the no-contact

4    order was entered on May 4th, 1999; is that right?

5          A.    It could have been before that also.  We had to

6    have it brought up twice.

7          Q.    Okay.

8          A.    It was violated, and there could have been two

9    occasions.

10          Q.    When was it violated?

11          A.    It was violated at the Pagoda Restaurant.

12          Q.    When was that?  It was on July 26th, 2000; isn't

13    that true.

14          A.    Yes.

15          Q.    I just want to be sure the record is clear.  The

16    first time the no-contact order was entered was on May 4th,

17    1999; isn't that right?

18          A.    It could have been that or one before.  I think

19    there were two, to the best of my ability.

20          Q.    How many times was the no-contact order

21    violated?

22          A.    Twice.

23          Q.    Was it violated before May 4th, 1999?

24          A.    I don't remember.

25          Q.    Do you have any evidence that it was violated

52

1   before May 4th, 1999?

2       A.   No.

3       Q.   Okay.  Now, getting back to this order, I'm

4   looking here at this letter, Defendant's Exhibit 4, Mr.

5   Malchman, this isn't signed by Judge Handy, is it?

6       A.   No, but there was an order from the bench

7   directed to the state's attorney's office.

8       Q.   I will give you an opportunity, and your lawyer

9   can have an opportunity to ask you questions later.

10      A.   Okay.

11      Q.   I just ask that you answer my question because

12  this will be put down, and you will see how the transcript

13  works.

14      A.   Okay.

15      Q.   This letter isn't signed by Judge Handy, is it?

16      A.   It is not.

17      Q.   And it doesn't indicate that it's copied to the

18  Norwich Police Department, does it?

19      A.   It does not.

20      Q.   And it doesn't list an enclosure or enclosures,

21  does it?

22      A.   What does that mean?

23      Q.   You know when you write a letter you put cc, and

24  sometimes you put E-N-C or enclosure to reflect whether the

25  letter includes an enclosure?

53

1      A.   I did not see this letter until after.

2      Q.   But my point is that this particular letter

3   doesn't list an enclosure; isn't that right?

4      A.   Correct.

5      Q.   And the first paragraph merely summarizes the

6   sum and substance of Judge Handy's order of no contact on

7   -- from May 4th; isn't that right?

8      A.   That's correct.

9      Q.   There is not a separate piece of paper that says

10  order and a writing out which is signed by Judge Handy

11  directing John Bogdanski to have no contact with you, is

12  there?

13     A.   No.

14     Q.   And there --

15     A.   Excuse me.

16     Q.   I'm asking you today, there is no document

17  existing today, a separate document signed by Judge Handy,

18  that sets forth the terms of the no-contact order, is

19  there?

20     A.   Yes, there is.

21     Q.   Okay.  And where is that document?

22     A.   In the court records.

23     Q.   Do you have a copy of that?

24     A.   No, I do not.

25     Q.   So you believe that that document exists in the

54

1   court record?

2        A.   I absolutely do.

3        Q.   Have you ever had a copy of that no-contact

4   order?

5        A.   No.

6             MR. MAHONEY:  Do you need to take a break?

7             THE WITNESS:  No.

8        Q.   (By Mr. Radshaw) Let's turn to paragraph -- let

9   me back up.  You have no evidence that a copy of the

10  no-contact order which you believe to be in writing in the

11  court's criminal file was ever provided to any member of

12  the Norwich Police Department, do you?

13       A.   No.

14       Q.   Turning to paragraph 12, you allege that

15  Bogdanski --

16            MR. MAHONEY:  If we need to talk, we can take a

17       break.

18       Q.   (By Mr. Radshaw) Bogdanski violated the

19  no-contact order at the Pagoda Restaurant; isn't that

20  correct?

21       A.   Absolutely.

22       Q.   And you furnished an independent witness?

23       A.   Absolutely.

24       Q.   And who was that witness?

25       A.   Mr. Darryl Burchman.

1      Q.   And you furnished a copy of Attorney Conopask's

2  letter to the police; isn't that right?

3      A.   I did not.

4      Q.   Okay.  So when, if we're reading paragraph 12 --

5      A.   They got it from the lawyer, my lawyer.

6      Q.   Let's focus on my question.  Why don't you have,

7  I think it's page -- it's paragraph 12.  Start in the

8  second sentence.  "The plaintiff filed a complaint with the

9  Norwich Police concerning the unlawful conduct, furnished

10  an independent witness to the event, and furnished a copy

11  of Attorney Conopask's letter to Mr. Bogdanski."  Reading

12  that second sentence, I'm left with the impression you

13  furnished a copy of Attorney Conopask's letter to

14  Mr. Bogdanski to the Norwich Police; is that true?

15      A.   That is correct.

16      Q.   So a few minutes ago you, when you said you

17  never provided this letter to the Norwich Police, you would

18  have been wrong?

19      A.   That is correct.

20      Q.   That's fine.  I just want to --

21      A.   There's a little more to it.

22      Q.   I understand.  Now, did you, at that time, ever

23  provide a copy of the written no-contact order that you

24  believed existed in the court's files to the Norwich Police

25  Department concerning the July 24th, 2000 incident?

1          A.    No.

2          Q.    Okay.  So, again, this is another example where

3     while the Norwich Police -- let me back up.  Do you know if

4     the Norwich Police generated a report as a result of this

5     incident?

6          A.    Absolutely.

7          Q.    And did they investigate this incident?

8          A.    Yes, they did.


9          Q.    And did they speak to you about it?

10         A.    Yes, they did.

11         Q.    Did they speak to Mr. Burchman?

12         A.    Yes, they did.

13         Q.    Did they take a statement from Mr. Burchman?

14         A.    Yes, they did.

15         Q.    Did they investigate by speaking to other people

16    who were at the Pagoda Restaurant?

17         A.    Yes, they did.

18         Q.    Did they take written statements from them?

19         A.    The Chinese people who were there really

20    couldn't speak English that well and didn't understand.

21         Q.    Did you understand my question?

22         A.    Yes.

23         Q.    So when I asked --

24         A.    No.

25         Q.    Let me ask the question again.  The officers

57

1   took statements from people who were employed by the

2   restaurant; isn't that true?

3        A.   Correct.

4        Q.   Okay.  So they did, in fact, investigate this

5   issue, but they did not investigate it sufficiently or as

6   much as you had wanted them to; is that correct?

7        A.   That is correct.

8        Q.   Okay.  That's understandable.

9        A.   That's easy.

10       Q.   And you believed that because the officers

11  didn't believe they could rely on Attorney Conopask's

12  summary of Judge Handy's order that they falsely claimed

13  there was no evidence that Judge Handy had issued such an

14  order; is that correct?

15       A.   They covered it up.

16       Q.   I understand that, and your attorney can have

17  the opportunity to ask you questions about cover-ups and

18  everything else.

19       A.   Okay.

20       Q.   So let me get back to my question, because you

21  make a serious allegation that the Norwich Police were

22  doing false things.

23       A.   Yes.

24       Q.   And I want to uncover the evidence of those

25  things.

1      A.    What went on in the courtroom with the Attorney

2  Hubert Santos, Judge Handy, and Mr. John Massameno.

3      Q.    Were any members of the Norwich Police

4  Department present?

5      A.    No.

6      Q.    And on what day did this colloquy go on between

7  Attorney Santos, Attorney Massameno, and Judge Handy?

8      A.    I do not remember the date.

9      Q.    And that was after the no-contact order was

10  violated?

11      A.    That is correct.

12           MR. MAHONEY:  Do you need to take a break?

13           THE WITNESS:  I'm fine.  He's not going to wear

14      me down.

15      Q.    (By Mr. Radshaw) Turning to paragraph 13, you

16  allege that July 28th, 2000, you received a threatening

17  phone call from Bogdanski; is that right?

18      A.    That's correct.

19      Q.    Did you have caller ID?

20      A.    No, I didn't.

21      Q.    So the fact that you believe it was Bogdanski is

22  solely based on your perception of his voice; is that

23  correct?

24      A.    That's correct.

25      Q.    And you don't have any documentary evidence that

1  would establish a telephone call was placed from the

2  Bogdanski residence to your residence at that time, do you?

3      A.   It wasn't a residence.

4      Q.   Where was it?

5      A.   It was my business.

6      Q.   Well then, do you have any evidence, documentary

7  evidence, that a phone call was placed from Bogdanski at

8  some location to you at your business?

9      A.   Yeah, my secretary was sitting there, and I was

10  -- I mean I was very upset.

11      Q.   What is your secretary's name?

12      A.   At that time, I think it was Tracy Sylvester.

13      Q.   Is Tracy still employed by you?

14      A.   No, she's not.

15      Q.   Is she still alive?

16      A.   Yes, she is.

17      Q.   Do you know where she lives?

18      A.   In Norwich.

19      Q.   So who answered the phone?

20      A.   I picked up in the office.  I pick up a lot.

21      Q.   And that's when you received the phone call from

22  the person whom you believe to be Mr. Bogdanski?

23      A.   I thought to believe, yes.

24      Q.   And when you say that your secretary has

25  evidence, she doesn't have any documentary evidence, right?

63

1       A.    No.

2       Q.    So she's just a witness to your exclamation that

3  it's Bogdanski; is that right?

4       A.    That is correct.

5       Q.    But if you were -- it's possible it could have

6  been somebody else?


7       A.    Absolutely.

8       Q.    Okay.  Now, I think I asked you this before, you

9  don't have any particular law enforcement training, do you?

10      A.    No.

11      Q.    You have never been a police officer?

12      A.    No.

13      Q.    Never taken any classes or education about law

14  enforcement?

15      A.    No.

16      Q.    Crime?

17      A.    No.

18      Q.    How about -- have you ever studied law?

19      A.    No.

20      Q.    Never been to law school?

21      A.    No.

22      Q.    Never passed the bar?

23      A.    No.

24      Q.    So what evidence do you have that -- withdraw

25  that question.  You called the police concerning the

64

1  threatening telephone call; isn't that right?

2       A.   Yes.

3       Q.   And they came out and investigated it?

4       A.   Yes.

5       Q.   And a report was generated?

6       A.   Yes.

7       Q.   Do you know if the Norwich Police took any other

8  steps?

9       A.   They said they called the telephone company,

10  they really couldn't prove it, and the officer said, look,

11  I went out and Bogdanski supposedly saw me driving down the

12  street and I said it wasn't at that time, and he said there

13  was really too much conflict to the thing and that I really

14  couldn't prove it and there's nothing -- could I prove it

15  was his voice, and I basically said no, so that was really

16  -- he did a good job.

17       Q.   So let's go over that.  So it's your testimony

18  that the police did contact you about the telephone call

19  trying to investigate this --

20       A.   Absolutely.

21       Q.   The mechanics of that?

22       A.   Absolutely.

23       Q.   And the police officer went out to speak to

24  Bogdanski?

25       A.   Absolutely.

1       Q.    And the officer tried to put it together; isn't

2   that right?

3       A.    Absolutely.

4       Q.    And you testified the officer did a good job but

5   he just couldn't establish it was Bogdanski on the phone;

6   isn't that right?

7       A.    That's correct.

8       Q.    All right.  On August 25th you called the police

9   because someone left a large rubber penis in your driveway;

10  is that right?

11      A.    I was in court with Judge Santinello in Groton.

12      Q.    Judge Santinello is a great judge.

13      A.    It wasn't court, it was called a referee, okay.

14      Q.    Let's back up.  Who discovered the rubber penis

15  in the driveway?

16      A.    My children.

17      Q.    And do you have any idea when it was that it

18  deposited it there?

19      A.    No.

20      Q.    The reason why you have no idea is because you

21  were at this meeting at some other location with Justice

22  Santinello?

23      A.    That is correct.

24      Q.    And who called the police?

25      A.    My wife.

66

1       Q.    Your wife called the police.  Did the police

2  respond?

3       A.    Yes, they did.

4       Q.    And they conducted an investigation; isn't that

5  right?

6       A.    They took the penis away.

7       Q.    Do you know if they -- sorry.  That sounds

8  funny.

9       A.    I'm sorry.

10       Q.    I'm sorry.  I have to ask a bunch of dumb

11  questions.  There's no nonfunny way to say it.

12       A.    He was mortified.  It was awful strange.

13       Q.    The police came out on the call; isn't that

14  right?

15       A.    Yes.

16       Q.    They conducted an investigation by speaking to

17  your wife; isn't that right?

18       A.    And children, yes.

19       Q.    They collected the object that was left there?

20       A.    Yes, they did.

21       Q.    And tagged it as evidence; isn't that right?

22       A.    Yes, they did.

23       Q.    Do you know if they conducted any other

24  investigation or analysis of the object in order to

25  determine who might have left it there?

67

1        A.    They fingerprinted it.

2        Q.    Are you aware if they were able to obtain any

3   readable or comparable fingerprints?

4        A.    They were not.

5        Q.    And isn't it true that neither your wife nor

6   your children saw the person or persons who deposited the

7   object on your driveway?

8        A.    That's correct.

9        Q.    And you're not aware of any witness who saw the

10  object be deposited on your driveway?

11       A.    That's correct.

12       Q.    So now tell me, how do you know that Bogdanski

13  knew you were at this meeting with Justice Santinello?

14       A.    He had this relationship with an investigator by

15  the name of Schroeder who works under the chief state's

16  attorney's office, under Mr. Massameno, and he would follow

17  up on an ongoing basis when I was going to the hearings,

18  when I was --

19       Q.    So you believe Schroeder told Bogdanski?

20       A.    That I was going to a hearing, that is correct.

21       Q.    What evidence do you have that Schroeder told

22  Bogdanski, or Bogdanski asked Schroeder and Schroeder told

23  him?

24       A.    Just from all the things that happened on the

25  same time in the way --

68

```
 1       Q.   But it's just your belief that he told him;

 2  isn't that right?

 3       A.   That's correct.

 4       Q.   All right.  Because you have no evidence to

 5  prove it?

 6       A.   No, no.

 7       Q.   For example, you weren't present --

 8       A.   No.

 9       Q.   -- with Bogdanski and Schroeder?

10       A.   No.

11            MR. MAHONEY:  Wait for him to finish.

12       Q.   (By Mr. Radshaw) So when you say in the second

13  sentence of paragraph 14 that the Norwich Police failed to

14  investigate the incident, that's really not true, is it?

15       A.   Well, they didn't find anything.

16       Q.   But they did investigate it, didn't they?

17       A.   They investigated it, but they didn't go around

18  to the neighbors.  They didn't --

19       Q.   So you believe, again, that they did some

20  investigation, but it wasn't a sufficient investigation?

21       A.   That's correct.

22       Q.   Okay.  So if we were to compare what I just --

23  your testimony here that it wasn't a sufficient

24  investigation, that's different than from failing to

25  investigate it at all; isn't that true?
```

69

1       A.    Somewhat.

2       Q.    Other than those incidents, the letters of '96,

3   the dog feces in '97, the threat mail in the fall of '98,

4   the mail in 1999, the chase, the no-contact order, the

5   phone call, and the rubber penis --

6       A.    There were more.

7       Q.    Okay.  What other incidents, or are there other

8   incidents in which you believe the Norwich Police failed

9   and refused to protect you from criminal conduct?

10      A.    Yes.

11      Q.    Okay.  Let's start with the first one after the

12  August 25th, 2000 incident.

13      A.    There was an incident where -- I'm trying to

14  think which one came first.  There were two more incidents.

15      Q.    So --

16      A.    I don't know the exact dates.

17      Q.    Let me ask you a couple dates, so we talk about

18  the universe of what we're dealing with, and then we will

19  talk about each one specifically.

20      A.    Okay.

21      Q.    So other than the ones that are listed in the

22  complaint, you believe there are two additional incidents;

23  is that correct?

24      A.    Yup.

25      Q.    And you're not sure which one came before the

1  other; is that right?

2      A.   That is correct.

3      Q.   Okay.  Well, let's start with in what year did

4  either -- did either or both occur?

5      A.   If I'm correct, I think last year one of them

6  occurred.

7      Q.   So that would have been in 2002 or 2003?

8      A.   Yes.

9      Q.   And that would have been subsequent to the

10  filing of the complaint, isn't that correct, after?

11     A.   Yes, after I filed the complaint.

12     Q.   And when I say "the complaint," I mean the

13  lawsuit we are here about today.

14     A.   Yes, it was after, correct.

15     Q.   So tell me, in no particular order, which you

16  believe -- if you believe which one is first, or perhaps if

17  you recall the season we could pin things down?

18     A.   My kids were going to school.  We will go with

19  the first one I think, and Mr. Bogdanski lives across the

20  street from my house, maybe from here to the white car,

21  which is maybe 100 feet.

22     Q.   Okay.

23     A.   150 feet.  And when he leaves his house to go

24  down the road, you go down the road on the right-hand side.

25  Well, he came across the road, directly across the road in

1    the front of my driveway on the opposite side of the road,

2    and my two young children were there going on the school

3    bus and he made the awfulest of faces.  My wife was in the

4    bathroom.  She watches the children go to school from the

5    window to catch the school bus because, you know, you watch

6    your kids get on the bus.  Bogdanski pulls by the house,

7    creeping by, making the most awfulest of facial expressions

8    to my two children.

9         Q.   Okay.  Were you present for this event?

10        A.   No, my wife and children were.

11        Q.   I understand that, but I just want to --

12        A.   No.

13        Q.   -- make sure who was there, you weren't there?

14        A.   No, not to the best of my recollection.

15        Q.   And did your wife call the police?

16        A.   I think she did.

17        Q.   Are you sure?  Do you know if she called the

18   police?

19        A.   I think she did.

20        Q.   Do you know if the police responded to your

21   wife's call?

22        A.   I think they did.

23        Q.   Okay.  And they came out and investigated this

24   issue?

25        A.   Yes, they did.

72

1     Q.    Okay.  And did they generate a report about

2 this?

3     A.    I think you have it.

4     Q.    And do you know if they spoke to Bogdanski or

5 not?

6     A.    Yes, I think they did.

7     Q.    Do you know what Bogdanski said?

8     A.    I have no idea.

9     Q.    Do you expect that Bogdanski probably denied it?

10     A.    Absolutely.

11     Q.    So it would be fair to say that the police did

12 investigate this incident, didn't they?

13     A.    Yes.

14     Q.    But, again, it's another example of where they

15 just didn't do sufficient, enough investigation to suit

16 what you believe to be the appropriate standard; is that

17 right?

18     A.    I think because of the litigation that's going

19 on now and Bogdanski being a protected witness in this

20 case, the state's protected witness, that I think they're

21 giving him special preference, yes.

22     Q.    But it's just another example of what you

23 believe the Norwich Police is not doing enough of a job to

24 meet your standard of what police should do?

25     A.    Yes, absolutely.

1      Q.    Essentially, you're suggesting that the police

2  are just -- they're just doing a shoddy job?

3      A.    I believe their hands are tied and they're not

4  able to follow through and do their job properly, that's

5  correct.

6      Q.    They're kind of doing, you know, 50% of what

7  they should, not 100% or 110%; is that right?

8          MR. MAHONEY:  Objection to the form.  You can

9          answer if you understand.

10          THE WITNESS:  I understand.  I think they're

11          doing 75%.

12      Q.    (By Mr. Radshaw) So it's not quite, you know,

13  10% of the job they're doing halfheartedly; is that right?

14      A.    But their hands are tied, uh-hmm.

15      Q.    Do you know if any citations were issued as a

16  result of that?

17      A.    No.

18      Q.    And what about the second incident?

19      A.    The second incident was my neighbor across the

20  street, his name is Frankie Bokoff, B-O-K-O-F-F.  He asked

21  me to help pull a couple hundred yews out of his yard, so I

22  got a friend of mine by the name of Kenneth Wiese to come

23  down and to contract as a favor for Frankie, and I was

24  talking with Mr. Wiese.  I was standing in my yard, on the

25  corner of my yard, Kenny was at his bulldozer, which is

1       Q.   So I guess my question is:  Do you know if, at

2    the time that Mr. Novak told you this stuff about

3    Bogdanski, whether he had a continuing relationship with

4    Bogdanski, or was Novak's relationship with Bogdanski at

5    some point in the past?

6       A.   I can't answer that.

7       Q.   Okay.  All right.  So other than the incidents

8    left in the complaint, the two we just talked about, and

9    then this thing with Novak, do you have any other evidence

10   that establishes your claim that the Norwich Police

11   Department has failed to protect you from the criminal

12   conduct of John Bogdanski?

13      A.   No.

14      Q.   Okay.  Tell me a little bit about your

15   educational background.

16      A.   I'm a dyslexic person.  I'm a nonreader.  I

17   really didn't kind of get through high school.  I had

18   something called viral pericarditis, and I stayed home, and

19   the state was very fortunate to provide teachers to come to

20   my house to teach me.

21      Q.   Was that in Worcester?

22      A.   No Norwich.

23      Q.   But you said earlier you were born in Worcester?

24      A.   I was born in Worcester, lived in the Cape, and

25   moved to Danielson, Connecticut, in 1960, moved to Norwich

80

1    in 1965.

2        Q.    Okay.

3        A.    And have been in Norwich since.

4        Q.    And tell me a little bit about your employment

5    history, starting, you know, after high school.

6        A.    I got a job.  Before I ended high school I got a

7    job working for a paper company, and in 1968 I was making

8    about $800 -- I was making $40,000 a year in the '60s and

9    doing pretty good.

10       Q.    Right.

11       A.    I was booking bands, musical orchestras, Sly and

12   the Family Stone, the Iron Butterfly.  I'm involved in

13   publishing.

14       Q.    And real estate you were telling me?

15       A.    Yeah, real estate, big, yup.  I can't read too

16   good, but other than that, I can do certain things, that's

17   why I have a lawyer for a partner.

18       Q.    Who is your partner?

19       A.    Attorney Stuart Greenfield, because I can't read

20   too well.  You need a guy to dot your Is and cross your Ts.

21            MR. RADSHAW:  Off the record for a moment.

22            (Off record discussion)

23            MR. RADSHAW:  Back on the record.

24       Q.    (By Mr. Radshaw) I will show you a document

25   premarked Defendant's Exhibit 3, and I'd like you to take

81

1  two minutes and take a look at that, and then I will ask

2  you some questions about it.  Have you seen that document

3  before?

4       A.   Yup.

5       Q.   And you understand that document is your

6  responses to my interrogatories and request for production;

7  isn't that right?

8       A.   Yes.

9       Q.   And I want to turn your attention to the

10  second-to-last page.

11       A.   This one right here?

12       Q.   Right.  And you see that the caption is "oath of

13  respondent"?

14       A.   Yup.

15       Q.   And there are typewritten words, Daniel G.

16  Malchman; is that right?

17       A.   Yup.

18       Q.   And above that is a signature?

19       A.   Yes.

20       Q.   Is that your signature?

21       A.   It is.

22       Q.   And you signed this oath as all the responses

23  being true and accurate to the best to your knowledge and

24  belief?

25       A.   It is.

89

1    investigated, and police officers came to the scene, turned

2    in reports, and failed to investigate the case."  Let's

3    start with the last part first.  When you say "failed to

4    investigate the case," as we have discussed, that sentence

5    should probably say failed to investigate the case to my

6    satisfaction, and when I say "my," I mean to Mr. Malchman's

7    satisfaction?

8         A.    No.

9         Q.    Do you recall us talking here today about the

10   complaints you have alleged in your complaint?

11        A.    Correct.

12        Q.    And in each one you told me that, well, the

13   police did some investigation, they just didn't do enough

14   investigation; is that right?

15        A.    That's correct.

16        Q.    So when I read the last part of this sentence,

17   that the police failed to investigate the case, that's not

18   really correct, like the sentence before?

19        A.    Correct.  I'm not a good writer.

20        Q.    I understand.

21        A.    Words.

22        Q.    But it would be more accurate to say the Norwich

23   Police, in your opinion, failed to investigate as much as

24   you wanted them to?

25        A.    As much as they should have.

90

1        Q.    Okay.  But that's based upon your opinion of

2    what the police should or should not do; is that right?

3        A.    That's correct.

4        Q.    Okay.  Now, the first part of that sentence,

5    there were many other complaints where cases that were not

6    investigated --

7        A.    Uh-hmm.

8        Q.    -- we have talked about the case -- the things

9    that were listed in your complaint?

10        A.    Uh-hmm.

11        Q.    The two additional complaints concerning your

12    children, the two face making incidents?

13        A.    Uh-hmm.

14        Q.    And this recent threat that you have told me

15    that happened two weeks ago?

16        A.    Uh-hmm.

17        Q.    That you were not going to report?

18        A.    Uh-hmm.

19        Q.    Are there any other complaints or cases were not

20    investigated as set forth in this answer?

21        A.    Yes.

22        Q.    Please tell me what that is.

23        A.    I don't remember the year.  It could have been

24    2000, 2001.  Carl Hoover came over to my house because Carl

25    was an alcoholic, and he always wanted, you know, a little

1  bit of wine or something, and I always really kind of liked

2  him.  I gave him my old shirts and kind of helped him.  To

3  see him, he was a tattered soul.  So he said to me, Danny,

4  you got to be careful.  I said why, Too Tall?  They call

5  him Too Tall, he's seven foot tall, like Lurch.

6          And he says, "John's going to take your neck and

7  he's going to snap it and kill you."  So I said, "Too Tall,

8  are you telling me the truth?"  And he said, "Danny, I'm

9  telling you the truth, on my heart."

10      Q.   And this is when Mr. Hoover was living in the

11  basement?

12      A.   No, not in the basement, in the house, but the

13  basement of Mr. Boganski's house.

14      Q.   Did you call the police?

15      A.   Yes, I did.

16      Q.   And do you know when you called the police?

17      A.   No, I do not remember.

18      Q.   Do you have any evidence that you called the

19  police?

20      A.   I saw the police officer there.

21      Q.   And they came out and investigated it, to your

22  belief?

23      A.   Yes.

24      Q.   And do you know if they talked to Mr. Hoover or

25  not?

1      A.   There was a trailer that was parked in a parking

2  lot directly across from my property that I own, not on my

3  property, that I let Charles LaValle borrow.  He stored

4  some planks of wood in that trailer.  That trailer was

5  impounded.

6      Q.   By whom?

7      A.   By the State of Connecticut.

8      Q.   It wasn't impounded by the Norwich Police

9  Department?

10     A.   They came along.  They were a party to the

11  thing.  He walked in with Schroeder to me.  Both Aldi and

12  Schroeder came together.

13     Q.   So because the Norwich Police accompanied the

14  State Department of Environmental Protection to the seizure

15  of this trailer, just by their presence you believe they're

16  involved?

17     A.   Well, he incited Tamberlyn Conopask by a comment

18  I made, guys talking, you know, she's over there laughing,

19  ha, ha, ha, I got him.

20     Q.   Did the Norwich Police arrest Mr. LaValle?

21     A.   LaValle, yeah.  He was charged the same as I

22  was.

23     Q.   But did the Norwich Police arrest him.

24     A.   No.  I turned myself in.  Ryan turned himself in

25  to Norwich.  Charlie was picked up by Schroeder.

1      Q.    Who charged -- what agency brought the charges

2    against Mr. LaValle?

3      A.    State of Connecticut.

4      Q.    It wasn't the City of Norwich, was it?

5      A.    No.  It was done at Norwich Police Department.

6      Q.    So because Mr. LaValle surrendered himself to

7    Norwich PD --

8      A.    He didn't surrender himself.  He was arrested.

9      Q.    Who put the cuffs on him?

10     A.    Mr. Schroeder.

11     Q.    It wasn't a Norwich police officer, was it?

12     A.    No.

13     Q.    But just because you believe they were there you

14   think it makes the City of Norwich involved?

15     A.    What do you mean there?

16     Q.    Present at the time Mr. LaValle was arrested?

17     A.    I wasn't there.

18     Q.    So you don't know what happened at that time?

19     A.    I was told in the cell by LaValle that Schroeder

20   came to his house.

21     Q.    So you have --

22     A.    And he threw him in the car.

23     Q.    So you weren't present for the arrest of

24   LaValle, you weren't present for the seizure of the trailer

25   at his place?

```
 1                      CERTIFICATE

 2        I, Heather A. Pellerin, License #00144, Notary Public

 3   for the State of Connecticut and Commonwealth of

 4   Massachusetts, do hereby certify that the deposition of

 5   DANIEL G. MALCHMAN, was taken before me pursuant to the

 6   Federal Rules of Civil Procedure, at the LAW OFFICES OF

 7   HOWD & LUDORF, Attorneys for the Defendant, 65 Wethersfield

 8   Avenue, Hartford, CT  06114-1190, (860) 249-1361,

 9   commencing at 10:00 a.m. on FRIDAY, APRIL 9, 2004.

10        I further certify that the witness was first sworn by

11   me to tell the truth, the whole truth, and nothing but the

12   truth, and was examined by counsel, and his testimony was

13   stenographically reported by me and subsequently

14   transcribed as herein before appears.

15        I further certify that I am not related to the

16   parties hereto or their counsel, and that I am not in

17   any way interested in the events of said cause.

18        Witness my hand this 20th day of April, 2004.

19

20        _____

21                   Heather A. Pellerin, RPR, CRR, Notary

22

23   My Commission expires:        My Commission expires:

24   May 25, 2008 (In MA)          April 30, 2006 (In CT)

25
```

114

1                       CERTIFICATE OF DEPONENT

2

3        I, DANIEL G. MALCHMAN, have read the foregoing

4    transcript of the testimony given at the deposition on

5    FRIDAY, APRIL 9, 2004, and it is true and accurate to the

6    best of my knowledge and/or with the changes as noted in

7    the attached errata sheet.

8

8                        _____

9                        DANIEL G. MALCHMAN

10


11        Subscribed and sworn to before me this _____

12   day of _____, 2004.

13

13                       _____

14                       Notary Public/Commissioner of Deeds

15

16   My Commission Expires:

17

18   NO:  CV.  3:01CV01877 (MRK)

18   DANIEL G. MALCHMAN

19   vs.

19   CITY OF NORWICH

20   DANIEL G. MALCHMAN, (a.m.) APRIL 9, 2004

21   HAP

22