Exhibit A

1        UNITED STATES DISTRICT COURT

2        DISTRICT OF CONNECTICUT

3   DANIEL G. MALCHMAN          :  3:01CV01877 (MRK)

4   VS.                         :  AT HARTFORD

5   CITY OF NORWICH             :  FRIDAY

6                               :  APRIL 9, 2004

7   DEPOSITION OF:  DANIEL G. MALCHMAN

8   APPEARANCES:

9   LAW OFFICES OF WILLIAMS & PATTIS, LLC
          Attorneys for the Plaintiff
10        51 Elm Street
          Suite 409
11        New Haven, CT  06510
          (203) 562-9931
12   BY:  TIMOTHY J. MAHONEY, ESQ.

13   LAW OFFICES OF HOWD & LUDORF
          Attorneys for the Defendant
14        65 Wethersfield Avenue
          Hartford, CT  06114-1190
15        (860) 249-1361
     BY:  JOHN J. RADSHAW, III, ESQ.

16

17

18

19

20

21

22

23

24

25

1   DANIEL G. MALCHMAN, called as a witness by the defendant,

2   having first been duly sworn by the Notary, was examined

3   and testified on his oath as follows:

4

5          MR. RADSHAW:  Usual stips?

6          MR. MAHONEY:  Yes, read and sign.

7

8   <u>DIRECT EXAMINATION BY MR. RADSHAW:</u>

9

10      Q.   Good morning, Mr. Malchman.

11      A.   Good morning.

12      Q.   My name is John Radshaw, and I am an attorney

13   here at Howd and Ludorf, and I represent the City of

14   Norwich in a lawsuit that you have brought against it, and

15   I want to go over a couple of ground rules.  Have you ever

16   had your deposition taken before?

17      A.   Yes.

18      Q.   Okay.  About how many times have you had it

19   taken?

20      A.   I think once.

21      Q.   Okay.  How long ago was that?

22      A.   Seven or eight years ago, maybe.

23      Q.   And what was that concerning, briefly?

24      A.   Somebody hit me in the back.

25      Q.   So it was as a result of a motor vehicle

1       Q.    And there is no relation.

2       A.    I know that, I already heard them.  I was

3  laughing when I came in, no offense.

4       Q.    And tell me -- I'm sorry I interrupted you.

5  Please continue.

6       A.    The reason I haven't filed the suit yet against

7  Mr. Bogdanski is that I'm in the middle of an in-depth

8  court trial --

9            MR. MAHONEY:  Remember, we're talking about this

10           lawsuit.

11           THE WITNESS:  But it all pertains to this

12           lawsuit.  It's all part.  It's all one scope.  There

13           will be more suits brought forthcoming.

14           MR. MAHONEY:  I understand.

15           THE WITNESS:  See, I'm not allowed to bring

16           anything, according to the court, against any of the

17           witnesses in the case, so I have to wait for the case

18           to be resolved, and when the case is resolved I will

19           go forth with my other suits.

20      Q.    (By Mr. Radshaw) As I understand, there is at

21  least one criminal charge against you that has to do with

22  illegal dumping?

23      A.    I didn't own the building, had nothing to do

24  with it.

25      Q.    I understand that, but as I understand it -- let

1   me ask the question.  As I understand it, the state is

2   accusing you of illegal dumping of something?

3       A.   That is correct.

4       Q.   And what are they accusing you of dumping

5   illegally?

6       A.   Okay.  I bought a building -- let me shut my

7   phone off because that's very rude.  Let me shut my phone

8   off.  I apologize.

9       Q.   No problem.  You have more than one?

10      A.   Yes.  I apologize.

11      Q.   I'm only interested in what are you accused of

12  dumping illegally.

13      A.   I have to explain it.

14      Q.   I will give you an opportunity to explain it.

15      A.   Sand grit, sand.

16      Q.   And was that allegedly contaminated with

17  something?

18      A.   Supposedly, yes.

19      Q.   And what was that allegedly contaminated with?

20      A.   Paint.

21      Q.   And that was lead paint?

22      A.   Correct.

23      Q.   And how is it that -- withdraw that.  And how is

24  it that Bogdanski fits into the illegal dumping, the

25  alleged illegal dumping of sand?

1      A.    Mr. Bogdanski, at the time, was a tenant in the

2  building.

3      Q.    And isn't it true that he makes a claim that

4  he's suffered some sort of injuries as a result of the

5  sand?

6      A.    According to the documents, yes, but according

7  to the state -- the toxicology, whatever that is, the

8  ingestion, you can only get it through the -- and it goes

9  out of your system right away.  It's not a child, whatever

10  that means, but you can come in, you can get a poof of it,

11  get a reading, and then the next day it's gone.

12      Q.    Because maybe an adult is bigger than a child?

13  The larger size of the adult's body might not suffer from a

14  small amount of this substance where a child, because

15  they're smaller, it might concentrate?  Is that what you're

16  trying to say?

17      A.    That is absolutely correct.

18      Q.    And when did Mr. Bogdanski first make these

19  claims?

20      A.    It was 1987, no, 1997, I apologize.

21      Q.    And is this the first incident that starts the

22  issues that you brought the lawsuit against the City of

23  Norwich?

24      A.    No.

25      Q.    Okay.  What is the first incident that forms the

1    basis of your complaint against the City of Norwich?

2         A.   To the best of my ability, there was an officer

3    by the name of captain or lieutenant, either or, he changed

4    from lieutenant to captain.  What are you first, captain?

5         Q.   Lieutenant first.

6         A.   He was probably lieutenant and then became

7    captain, so Lieutenant/Captain Robert Aldi.

8         Q.   And when did that occur?  What date,

9    approximately?

10        A.   The ongoing feud, probably 1996, somewhere in

11   that vicinity, '96, '97, in that vicinity.

12        Q.   And what is it that Lieutenant or Captain Aldi

13   did in 1996 to commence this feud?

14        A.   What happened was that -- I can say Mr. Aldi?

15   Mr. Aldi grew up in Mr. Bogdanski's backyard as kids,

16   Mr. Aldi lived here.  Mr. Bogdanski lived here,

17   house-to-house, backyard-to-backyard, and they grew up as

18   best friends, school bus, high school, and whatever.  John

19   would call Bobby, Aldi, and tell Mr. Aldi that I was giving

20   him grief, I was not giving him enough heat, I was all

21   kinds of crazy things.

22             So Mr. Aldi would call me on the phone and say

23   to me, Danny, please, why don't you leave John alone?  And

24   I would say, Bob, there's two sides to a story.  Please

25   don't get in the middle.  Please don't get in the middle.

Nziankiewicz & Miller Reporting Services
Case 3:01-cv-01877-MRK    Document 5-2    Filed 08/12/2004    Page 8 of 25
East Hartford, CT  06108
(860) 291-9191

14

1    And what happened was the case blew out of proportion, and

2    Bobby got in the middle of the case, and there were several

3    incidents that happened.

4        Q.    Tell me what those incidents are.

5        A.    Okay.  One of the incidents I was eating at the

6    Pagoda Restaurant in Norwich, Connecticut, and having

7    dinner with a Darryl Burchman, the manager of Central

8    Sports.

9        Q.    Okay.  All right.  I will tell you what.  I know

10   about the incident, and I will ask you couple questions

11   about that later.

12       A.    Okay.  Fine.

13       Q.    Let me show you a document that's been premarked

14   Defendant's Exhibit 2.

15       A.    Yup.

16       Q.    Why don't you take a look at this document and

17   tell me if you have seen it before.

18       A.    Yes, I have.

19       Q.    Okay.  And Defendant's Exhibit 2 is a complaint

20   dated October 1st, 2001?

21       A.    That is correct, um-hmm.

22       Q.    It's six pages?

23       A.    Yup.

24       Q.    Captioned Daniel Malchman versus City of

25   Norwich?

1    A.   Yes, that's correct.

2    Q.   Have you seen this document before?

3    A.   I think I dictated the document.

4    Q.   Okay.  So you think you drafted it?

5    A.   Yes.

6    Q.   Okay.  Turning your attention to paragraph 15,

7  it states the Norwich Police Department have, over a period

8  of years, engaged in a consistent, persistent, and widely

9  known pattern and practice of failing and refusing to

10  protect the plaintiff from criminal conduct, placing him

11  outside the protection of the law." Is that right?

12    A.   Absolutely correct.

13    Q.   That's the basis of your claim; isn't that

14  right?

15    A.   That's one of them.

16    Q.   Okay.  And what are the other bases of your

17  complaint, what other bases are there?

18    A.   That the Norwich Police knowingly gave

19  information to Mr. -- I shouldn't say that.  Robert Aldi

20  gave information to the state investigator.

21    Q.   Is Robert Aldi a defendant in this case?

22    A.   He's -- what do you mean?  I don't understand.

23    Q.   Is he a named defendant?  Was he served and

24  named as a named defendant in this case?  I mean, if you

25  don't know, you don't know.

1    your complaint against the City of Norwich?

2        A.    Yes.

3        Q.    Okay.  What is the next basis against the City

4    of Norwich?

5        A.    There was detective by the name of Daigle.

6        Q.    All right.  Let me ask you -- okay.  And what

7    did Detective Daigle do?

8        A.    There was an incident that happened, I think it

9    was maybe the year -- around 2000, that the state came and

10   said there was some planking that was in the trailer that

11   did not belong to me.

12       Q.    And you claim that that incident reflects the

13   City of Norwich's policy and practice of failing to protect

14   you from criminal conduct?

15       A.    No, just to enrage the State of Connecticut.

16   They went and personally caused some severity with the

17   state prosecutor.

18       Q.    Other than the failure to protect by Daigle and

19   Aldi, are there any other incidents -- let me ask a better

20   question.

21            As far as I can tell from reading this

22   complaint, the theory that you have advanced is that the

23   Norwich Police Department has failed to protect you from

24   criminal conduct; is that correct?

25       A.    Yes.

1    that.

2        A.    The police reports.

3        Q.    Okay.  Let's start with paragraph 6, paragraph 6

4    of Defendant's Exhibit 2.  You allege that on the night of

5    October 31st through November 1st, 1996, at your residence

6    on Tanglewood Drive, your automobile was spray painted with

7    a swastika; is that correct?

8        A.    Swastikas, many.

9        Q.    How many were there?

10       A.    Four or five.

11       Q.    And you also allege that you reported this hate

12   crime to the Norwich PD?

13       A.    Yes, I did.

14       Q.    And you provided investigating officers with the

15   name of the most likely perpetrator; is that right?

16       A.    Which I thought at that time, right.

17       Q.    And then the last sentence here is, "Although

18   the police pretended to investigate the crime they, in

19   fact, conducted no investigation of the chief suspect

20   because of his connections to Robert Aldi, at that time a

21   prominent member of the Norwich PD."  Is that right?

22       A.    That is correct.

23       Q.    Let's take that sentence right there.  What

24   evidence do you have that the police pretended to

25   investigate the crime?

1      A.    Well, I spoke with now, his name is lieutenant,

2   captain, I think he's lieutenant, Lieutenant Rusty Ward at

3   a later date, and he told me that they dropped the ball on

4   the case.  In fact, he did it in front of the city manager

5   in Norwich within the last six months, that was one thing.

6      Q.    What is this guy's name?

7      A.    Captain or lieutenant, I think he's lieutenant

8   now, Lieutenant Rusty Ward, in a meeting, because there was

9   another incident that happened with the fire department,

10  which there will be another case coming up shortly.

11     Q.    Okay.

12     A.    Okay.

13     Q.    What did Rusty Ward say to you that made you

14  think that the -- let me ask you a question, when was this

15  written?

16     A.    When was this written?

17     Q.    Yeah, Defendant's Exhibit 2?

18     A.    It says here October 1st, 2001.

19     Q.    What evidence did you have on or about

20  October 1st, 2001, that the police pretended to investigate

21  the hate crime incident with the spray painting of

22  swastikas?

23     A.    They never went and talked to --

24     Q.    No, no, what evidence do you have?

25     A.    Evidence?

1    Q.   Yes.

2    A.   In speaking to Captain Aldi on about 20

3  occasions and talking to him, he kept telling me that the

4  investigation was going on and little to no -- after he got

5  out of the police department, I went in and had a

6  conversation with Rusty Ward, that it wasn't, and just

7  within the last year they sent detectives out again on the

8  same case, questioning neighbors.

9    Q.   Now, do you have any training in law

10  enforcement?

11    A.   No.

12    Q.   And I was going to say you probably don't

13  have -- you can't be in all places at all times; is that

14  right?

15    A.   No, nobody is.

16    Q.   Okay.  And this is the incident that occurred

17  sometime on the night of October 31st; isn't that right?

18    A.   If that's the date that's down, that's correct.

19    Q.   Do you know if -- now, when you called the

20  police, did the police come out?

21    A.   Yes, they did.

22    Q.   Okay.  And do you know if a report was

23  generated?

24    A.   Yes, but it was not turned in to the State of

25  Connecticut.  It was not followed through.

1    Q.    Okay.  But is it possible?

2    A.    No.

3    Q.    So you're telling me that the evidence that the

4  police conducted no investigation whatsoever of this

5  incident is based on what Mr. Ward said to you; is that

6  right?

7    A.    Almost.  They did a little bit.  They didn't

8  follow-up.  They didn't do the hate crime report.

9    Q.    So when it says here that they, in fact,

10  conducted no investigation in paragraph 6, that's wrong; is

11  that correct?

12    A.    That is correct.

13    Q.    Okay.  So that particular statement is not

14  appropriate in this complaint?

15    A.    No.  I disagree.

16    Q.    So --

17    MR. MAHONEY:  You disagree?

18    THE WITNESS:  I disagree with that.

19    Q.    (By Mr. Radshaw) That's fine.

20    A.    Okay.  I disagree.

21    Q.    And what exactly did Mr. Ward say to you?

22    A.    He informed me that in a case like this there

23  should be a document done for the State of Connecticut

24  called a hate crime report.

25    Q.    A hate crime, okay.

1      A.   And that report was not filed.  It was not

2   followed through.

3      Q.   Let's back up.  It's your testimony that a hate

4   crime report was not filed with the State of Connecticut;

5   is that correct?

6      A.   That is correct.

7      Q.   Is it your claim that a hate crime report on

8   state -- State of Connecticut forms was not, in fact,

9   filled out at all?

10      A.   It was not filed.

11      Q.   When you say it's not filed, what do you mean by

12   "not filed"?

13      A.   You have to mail it and file it and send it to

14   the State of Connecticut.

15      Q.   And on what evidence do you have that that

16   report was not filed with the State of Connecticut?

17      A.   Calling the State of Connecticut hate crime

18   unit.

19      Q.   Who did you call?

20      A.   The office.

21      Q.   And do you know who you talked to?

22      A.   No, I don't.

23      Q.   When did you call them?

24      A.   2000 -- 2002.

25      Q.   And so that was in 2002?

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter

1    question, yes or no, did the Norwich Police Department

2    investigate the 1996 hate crime incident?

3         A.   Yes.

4         Q.   Thank you.  But I understand that you believe

5    that they did not do a proper investigation; is that

6    correct?

7         A.   That is correct.

8         Q.   And it's your belief that it's substandard, that

9    there are other things they should have done; they should

10   have worked harder on it, including, you believe, they

11   should have sent this particular form to a particular

12   office in the State of Connecticut; is that correct?

13        A.   That's correct.

14        Q.   Okay.  Now, turning your attention to

15   paragraph 7 of the plaintiff's complaint, which is

16   Defendant's Exhibit 2, it says that "sometime on the

17   evening of October 31 to November 1, 1997, dog feces were

18   placed in the plaintiff's mailbox."

19        A.   Uh-hmm.

20        Q.   Now, then the last sentence of that paragraph

21   says, "The Norwich Police failed or refused to investigate

22   the incident."  Let's start with how did you discover that

23   there were dog feces in your mailbox?

24        A.   I went out to the mailbox to get my mail and it

25   was full of shit.

1    Q.   Got you.

2    A.   Excuse me.

3    Q.   Now, did you see -- let me back up.  Turning

4  back to the hate crime incident in 1996, you didn't see who

5  spray painted the swastikas on your car, did you?

6    A.   No, I did not.

7    Q.   And no member of your family saw who spray

8  painted the swastikas on your car, did they?

9    A.   No, they did not.

10    Q.   And you do not have the names of any person who

11  witnessed the spray painting of the swastikas; is that

12  correct?

13    A.   No, I do not.

14    Q.   Let's go back to the dog feces, and I will ask

15  you the same bunch of questions.  You didn't see who put

16  the dog feces in your mailbox, did you?

17    A.   No, I did not.

18    Q.   And no member of your family saw them?

19    A.   No, they did not.

20    Q.   And you have no information or witnesses that

21  would -- withdraw that.

22       You have no witnesses that saw the dog feces get

23  put in your mailbox; is that correct?

24    A.   No, I did not.

25    Q.   Okay.  After you found the dog feces in your

1    mailbox did you call the police?

2         A.    Yes, I did.

3         Q.    And what happened next?

4         A.    I asked the police to please check the feces

5    samples, because Mr. Bogdanski had a big dog, you know, in

6    his backyard, and it was fresh.  I mean, it was a fresh

7    feces.  It was real nasty.

8         Q.    That's terrible.  I'm sorry.

9         A.    And it would not be a hard lab test to check,

10   and according to my reports, it was never done.

11        Q.    Now, let's back up.  Did a police officer come

12   out and speak to you?

13        A.    Yes, he did.

14        Q.    Do you remember who it was?

15        A.    No, I don't.

16        Q.    But an officer did, in fact, come out and speak

17   to you?

18        A.    Absolutely.

19        Q.    And a report was generated concerning this

20   incident; is that correct?

21        A.    That is correct.

22        Q.    And other than his -- that officer's interview

23   of you after the incident occurred in 1997 about the dog

24   feces, you have no personal knowledge of what else that

25   officer or some officer might have or might not have done;

1    is that true?

2          A.    Well, I called the department on numerous times

3    speaking to -- captain or lieutenant, Mr. Aldi, I don't

4    know which, asking him to do certain things and check

5    certain things and asking about -- when I got the police

6    report from the police department, it did not show, or it

7    didn't show me that the feces was ever checked like I

8    asked.

9          Q.    So back on paragraph 7, that last sentence where

10    it says, "The Norwich Police failed to investigate this

11    incident," that's not true, is it?

12          A.    They didn't follow-up on it.

13          Q.    But they did, in fact, come out and investigate

14    the incident when they talked to you; is that right?

15          A.    They talked to me.

16          Q.    And they collected as much information as was

17    available; is that right?

18          A.    As much dog feces, yes.

19          Q.    And did they take the dog feces with them?

20          A.    Some.

21          Q.    And it's your claim that because they did not do

22    an analysis of the dog feces that were there in your

23    mailbox with the dog feces that might have been found at

24    Mr. Bogdanski's house, that that was a substandard

25    investigation; is that right?

1        A.    Yes, I do believe that.

2        Q.    But you concede they did some investigation?

3        A.    Yes.

4        Q.    It's just that you don't believe that they did

5   enough of an investigation to suit you; is that right?

6        A.    That's correct.

7        Q.    Okay.  Now, in paragraph 8 that goes over to the

8   next page in Defendant's Exhibit 2, you allege that on

9   October 26th, 1998, and again on November 3rd, you received

10  harassing and threatening mail, and you believe this mail

11  to have been sent to you by Bogdanski; is that right?

12       A.    Absolutely.

13       Q.    Okay.  And you reported this hate mail to the

14  police; is that right?

15       A.    That is correct.

16       Q.    And did an officer come out and talk to you?

17       A.    Yes, he did.

18       Q.    And was a report generated, if you have any

19  knowledge of that?

20       A.    Yeah, I think, so.

21       Q.    Okay.  And was the October 26th, 1998 mail

22  signed "love, neighbors"?

23       A.    I don't remember.  There were several of them.

24       Q.    And do you know if the Norwich Police took that

25  letter and took it as evidence?

1        A.   Yes.

2        Q.   And you believe that it was Bogdanski that did

3   this; is that right?

4        A.   I absolutely do.

5        Q.   Now, do you know -- and then there was the

6   November 3rd incident; is that right?

7        A.   What number is that, please?

8        Q.   It's still in paragraph 8.  It starts on the

9   bottom of one page and goes over to the other.

10       A.   Okay.  All right.

11       Q.   Do you know if this information, your complaint

12  and the evidence, was forwarded to the detective division

13  of the City of Norwich?

14       A.   It was.

15       Q.   So you know that it was, so someone else did

16  something; is that right?

17       A.   It was Captain Robert Aldi.

18       Q.   Do you know at any point in time whether the

19  Norwich Police Department forwarded -- withdraw that.  Did

20  you retain a document examiner to examine the documents?

21       A.   Yes, I did.

22       Q.   And that's Clarissa DeAngelis?

23       A.   Yes.

24       Q.   And she's located in New London?

25       A.   Yes, she is.

1    Q.    And she come to a conclusion that the documents

2  were, in fact, authored by Malchman?

3    A.    No, I'm Malchman.

4    Q.    I'm sorry, Bogdanski?  Let me withdraw that

5  question and ask another one.  My apologies.

6    A.    Okay.

7    Q.    Did DeAngelis, the person you retained, conclude

8  that Bogdanski was, in fact, the author of the October and

9  November 1998 letters?

10    A.    To the best of my ability in remembering, she

11  said it was more probable.  They don't answer in those

12  kinds of ways.  It was you know, probably yes.

13    Q.    Do you know if the Norwich Police forwarded the

14  October '98 and November '98 letters to the state police

15  forensic laboratory for examination?

16    A.    Yes.

17    Q.    And did they?

18    A.    Yes.

19    Q.    And they conducted an investigation which

20  included handwriting exemplars both from you, your wife,

21  and from Mr. Bogdanski?

22    A.    And his girlfriend, yes.

23    Q.    And isn't it true that the state police

24  laboratory's examination was inconclusive and they could

25  not determine who wrote the letters based on those

1    exemplars?

2        A.    According to the paperwork, yes.

3        Q.    Turning your attention to the last sentence of

4    paragraph 8, where you concede, although a forensic

5    examination of the handwriting exemplars was conducted and

6    demonstrated that Bogdanski himself was not the author, you

7    state the police failed or refused to pursue any further

8    investigation; is that right.

9        A.    Of not just that, of the crimes, all the stuff,

10    other than this.

11        Q.    But this paragraph -- this sentence modifies

12    what's in this paragraph, so focused on the October 26th,

13    1998 letter and November 3rd letter, again, your claim is

14    while the Norwich Police did some investigation, including

15    sending these letters to this Connecticut State Police

16    forensic laboratory, they didn't do enough of an

17    investigation for you; is that correct?

18        A.    That's correct.

19        Q.    Okay.  What more would you have liked them to do

20    just with regard to these two letters?

21        A.    There were actually three letters.  They hid one

22    of the letters.

23        Q.    Whether it's two or three letters --

24        A.    Uh-hmm.

25        Q.    -- what more would you have had the Norwich

1    Police Department do with regard to the investigation of

2    the letters referenced in paragraph 8 of Defendant's

3    Exhibit 2?

4        A.    There was a third member in that household by

5    the name of Carl Hoover, and I asked to have his

6    handwriting --

7        Q.    who is Carl Hoover?

8        A.    He was a guy that Mr. Bogdanski found in a

9    dumpster in Dayville, Connecticut, living in a dumpster,

10   and Mr. Bogdanski took him as his slave to live in the

11   basement, feed him liquor, and to work him 100 hours a week

12   in his business for small chump change of money.

13       Q.    So you believe that Hoover was a potential

14   author of the letters; is that right?

15       A.    That is correct.

16       Q.    And you believe that Hoover was acting alone

17   when he wrote these letters?

18       A.    If he wrote them, no.

19       Q.    Why would Carl Hoover write these letters to

20   you?

21       A.    Because John Bogdanski would tell him to do

22   something and he would do it.

23       Q.    But you have no personal knowledge that -- or

24   evidence that would establish that Bogdanski prompted

25   Hoover to write these letters back in 1998?

1       A.    I do not.

2       Q.    And you have no witnesses that would suggest

3    this?

4       A.    I do not.

5       Q.    So your belief is really just supposition and

6    conjecture; is that right?

7       A.    No.  It's not correct.

8       Q.    It's not -- if you have no evidence, it's just

9    your belief?

10       A.    The police didn't follow it up.

11       Q.    So, again, because the police did not

12    investigate Mr. Hoover, that's another example of what you

13    believe to be their substandard investigation?

14       A.    That is correct.

15       Q.    Okay.  All right.  And then, in paragraph 9 of

16    Defendant's Exhibit 2, you allege that you received a

17    letter on April 12th, 1999 that says no one forgets; is

18    that correct?

19       A.    That's correct.

20       Q.    And you did, in fact, report this to the Norwich

21    Police?

22       A.    That's correct.

23       Q.    But the Norwich Police came out and investigated

24    that; is that right?

25       A.    That is correct.

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter