Exhibit A,
cont.

1      Q.   And what evidence do you have that the Norwich

2   Police refused to conduct a handwriting analysis of the

3   letter received in April of 1999?

4      A.   Because I asked them also to check on

5   Mr. Hoover, and again Mr. Hoover was not checked on.

6      Q.   And that's the only reason why they refused to

7   do a handwriting examination?  I'm sorry, withdraw that

8   question.  That didn't make any sense.  My apologies.

9      A.   No problem.

10      Q.   With regard to the April 12th, 1999 letter, you

11   reported the crime; is that correct?

12      A.   That is correct.

13      Q.   And you requested that Bogdanski's handwriting

14   be compared to that letter; is that correct?

15      A.   That is correct.

16      Q.   But it's your testimony that Norwich Police

17   refused to compare it to Bogdanski's handwriting; is that

18   correct?

19      A.   I did not say that.  I said one of the letters.

20      Q.   Let's read the second sentence in paragraph 9.

21   "When he reported this crime to the Norwich Police and

22   asked that the handwriting be compared to that of

23   Bogdanski, they refused to do so."  Do you see that?

24      A.   That's correct.

25      Q.   And the "he" in that sentence would be you; is

1    that correct?

2         A.   If I'm correct, that was the missing letter I

3    asked about.  There was three that were sent to the state

4    forensic lab.

5         Q.   Let me just get back to my question, all right?

6         A.   Uh-hmm.

7         Q.   You have paragraph 9 there in front of you?

8         A.   Uh-hmm.

9         Q.   When you say "um-hmm," you mean yes?

10        A.   Yes.

11        Q.   The second sentence says, "When he reported this

12   crime to the Norwich Police and requested that the

13   handwriting be compared to the handwriting of Bogdanski,

14   they refused to do so."  Do you see that sentence?

15        A.   I don't see where he's talking about.

16        Q.   Paragraph 9?

17             MR. MAHONEY:  Starting there.

18             THE WITNESS:  Oh.  "He" must have been me.

19        Q.   (By Mr. Radshaw) That's what I'm asking you.  In

20   the context of the sentence "he" is the plaintiff, Daniel

21   Malchman?

22        A.   That is correct.

23        Q.   The "they" in the sentence is the Norwich

24   Police?

25        A.   That's correct.

Case 3:01-cv-01877-MRK Document 64 Miller-Reporting 07/12/2004 Services 4 of 26

1    wouldn't you?

2        A.    Yes.

3        Q.    Okay.  So for each new piece of threatening

4    mail, all the persons' handwriting to whom that new piece

5    of mail would be compared to would have to submit a new

6    piece of mail, a new exemplar; isn't that true?

7        A.    That's correct.

8        Q.    So Mr. Bogdanski refused to cooperate, and he

9    did not submit an exemplar of the April 12th, 1999 letter,

10   did he?

11       A.    That's what you're saying.

12       Q.    So how could the Norwich Police compare it to

13   Mr. Bogdanski's handwriting if he refused to provide an

14   exemplar?

15       A.    They couldn't.

16       Q.    So, again, you concede that with regard to the

17   April 12th letter, the Norwich Police did some

18   investigation.  They did talk to you.  They did check this

19   particular item for fingerprints, but they didn't do

20   enough; isn't that right?

21       A.    They did not -- again, when I say "again,"

22   Mr. Hoover is there, would you please ask him -- nothing

23   was done.

24       Q.    Okay.  But there's nothing in your complaint

25   that mentions Mr. Hoover, does it?

972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

1      A.   No. You're asking me a question.

2      Q.   But isn't it true that there is nothing in your

3  complaint -- you don't mention Carl Hoover anywhere in your

4  complaint?

5      A.   Carl Hoover, and I'm telling you, is just a poor

6  human being, I mean a very sad case.

7      Q.   I understand that, but you don't mention Carl

8  Hoover--

9      A.   No, no.

10     Q.   -- as a potential author of any of the letters

11  in the complaint, do you?

12     A.   No, except to the police.

13     Q.   You don't mention him anywhere in here?

14     A.   No.

15     Q.   Do you have any evidence that you told the

16  police that Carl Hoover was the possible author of these

17  documents?

18     A.   Other than me calling Captain Aldi, no.

19     Q.   So you never wrote a letter to the police saying

20  you better check Carl Hoover?

21     A.   No. I thought I had a better relationship.

22     Q.   So you mentioned Bogdanski?

23     A.   Yes, but you don't see his girlfriend's name

24  down here, living in the same house.

25     Q.   Now, turning your attention to paragraph 10, in

1   approximately 1999 or 2000 you claim that Bogdanski chased
2   your vehicle at high speed, correct?
3       A.   Absolutely.
4       Q.   Tell me exactly when that happened.
5       A.   It happened in the evening.  I had a Lincoln
6   Town Car at the time.  I was driving down Plainville Road,
7   and all of a sudden on my bumper is John Bogdanski in his
8   Ford Explorer or Ford Bronco, whatever it is, right on my
9   bumper.  As I speeded up, he speeded up.  It was in a 25
10  zone.  By the time I hit the bottom of the hill I was doing
11  60 miles per hour, and I skirted through the intersection,
12  luckily not hitting anybody, and went to the police
13  station.
14      Q.   And what happened after that?
15      A.   Nothing.
16      Q.   Did Mr. Bogdanski follow you to the police
17  station?
18      A.   No, he did not.
19      Q.   And did you speak to an officer?
20      A.   Yes, I did.
21      Q.   Okay.  And did the officer complete a report?
22      A.   That I can't tell you.  I don't know.  I don't
23  remember.  I should answer in that way.
24      Q.   And do you have any personal knowledge what the
25  officer might have or some other officer might have done

1    concerning that particular incident?

2        A.   I had my wife and children in the car.  I had

3    two young children in the car, and I was more shook up, my

4    wife and I, that this individual could chase us in a

5    children -- I mean a 25 zone, into an intersection, where

6    cars are coming, a main route.  It was one of the most

7    scariest times I probably ever had in my life.

8        Q.   Do you remember when in 1999 that was?

9        A.   The night I went to the police station, whatever

10   date it was.

11       Q.   It could have been in 2000, you don't know

12   either?

13       A.   No, I do not remember.  I went down -- whatever

14   date the report said is the date it happened.

15       Q.   Okay.  And it is your complaint that the

16   officers took no action; is that right?

17       A.   That is correct.

18       Q.   Do you know whether or not they spoke to

19   Bogdanski?

20       A.   I do not.  They never spoke to my wife.  I mean,

21   come on, she's in the car.  This is ridiculous.

22       Q.   Did she go into the police station?

23       A.   No, we had two little children.  She sat in the

24   car with the children at that time they were very young.

25       Q.   How many children do you have?

1     A.   There are two.

2     Q.   Who are they?

3     A.   One's name is Deanna Ruth, and Deanna is 14

4 years old, and then I have a daughter named Julianna

5 Louise, and Julie is 12 years old.

6     Q.   So back in 1999 they would have been eight and

7 nine; is that about right?

8     A.   Correct.

9     Q.   All right.

10    A.   You got kids crying.  What are you going to do?

11    Q.   We will come back to that.  In paragraph 11 of

12 Defendant's Exhibit 2 you allege that on May 4th, 1999, the

13 judge entered a no-contact order between you and Bogdanski;

14 is that right?

15    A.   Absolutely.

16    Q.   Do you have a copy of that order?

17    A.   You do.  It's in the police report.

18    Q.   You're sure that -- let me ask you a question,

19 do you have a copy of that?

20    A.   Yes, I have.

21    Q.   And I take it you have evidence that deputy

22 assistant Tamberlyn Conopask, C-O-N-O-P-A-S-K, informed

23 Bogdanski; is that correct?

24    A.   Informed him?

25    Q.   Yes.

1    A.    Yes.  It was done by Judge Handy from the bench,
2 yup, and a letter to him.
3    Q.    Do you know if there was ever a written order
4 that was reduced to paper as a result of Judge Handy's oral
5 order from the bench?
6    A.    Yes.  There was a letter from the state's
7 attorney's office to Mr. John Bogdanski, uh-hmm, and you
8 have it in your hand.
9         MR. RADSHAW:  Can we mark this as Defendant's
10        Exhibit 4.
11            (Defendant's Exhibit 4, May 13th, 1999 Document,
12            Marked for Identification)
13    Q.    (By Mr. Radshaw) Showing you a document that's
14 been marked Defendant's Exhibit 4, it's the State of
15 Connecticut Department of Criminal Justice addressed to
16 John Bogdanski, and it is signed by what appears to be
17 Tamberlyn -- T-A-M-B-E-R-L-Y-N, Conopask.  Have you seen
18 that letter before?
19    A.    Yes, I have.
20    Q.    And you believe that's the evidence of the
21 existence of the order; is that right?
22    A.    This is not the first order.  There was one
23 before this from the bench orally, also directed by Judge
24 Handy directly to Mr. Bogdanski.
25    Q.    Tell me what the date of that letter is?  It's

Minx and Miller Reporting Services
972 Tolland Stre
East Hartford, CT 06108
(860) 291-9191

1   May 13th, isn't that right, 1999?

2       A.   Yes.

3       Q.   And it's your testimony that the no-contact

4   order was entered on May 4th, 1999; is that right?

5       A.   It could have been before that also.  We had to

6   have it brought up twice.

7       Q.   Okay.

8       A.   It was violated, and there could have been two

9   occasions.

10      Q.   When was it violated?

11      A.   It was violated at the Pagoda Restaurant.

12      Q.   When was that?  It was on July 26th, 2000; isn't

13  that true.

14      A.   Yes.

15      Q.   I just want to be sure the record is clear.  The

16  first time the no-contact order was entered was on May 4th,

17  1999; isn't that right?

18      A.   It could have been that or one before.  I think

19  there were two, to the best of my ability.

20      Q.   How many times was the no-contact order

21  violated?

22      A.   Twice.

23      Q.   Was it violated before May 4th, 1999?

24      A.   I don't remember.

25      Q.   Do you have any evidence that it was violated

972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

54

```
1    court record?
2         A.   I absolutely do.
3         Q.   Have you ever had a copy of that no-contact
4    order?
5         A.   No.
6              MR. MAHONEY:  Do you need to take a break?
7              THE WITNESS:  No.
8         Q.   (By Mr. Radshaw) Let's turn to paragraph -- let
9    me back up.  You have no evidence that a copy of the
10   no-contact order which you believe to be in writing in the
11   court's criminal file was ever provided to any member of
12   the Norwich Police Department, do you?
13        A.   No.
14        Q.   Turning to paragraph 12, you allege that
15   Bogdanski --
16              MR. MAHONEY:  If we need to talk, we can take a
17        break.
18        Q.   (By Mr. Radshaw) Bogdanski violated the
19   no-contact order at the Pagoda Restaurant; isn't that
20   correct?
21        A.   Absolutely.
22        Q.   And you furnished an independent witness?
23        A.   Absolutely.
24        Q.   And who was that witness?
25        A.   Mr. Darryl Burchman.
```

1    Q.    And you furnished a copy of Attorney Conopask's

2  letter to the police; isn't that right?

3    A.    I did not.

4    Q.    Okay.  So when, if we're reading paragraph 12 --

5    A.    They got it from the lawyer, my lawyer.

6    Q.    Let's focus on my question.  Why don't you have,

7  I think it's page -- it's paragraph 12.  Start in the

8  second sentence.  "The plaintiff filed a complaint with the

9  Norwich Police concerning the unlawful conduct, furnished

10  an independent witness to the event, and furnished a copy

11  of Attorney Conopask's letter to Mr. Bogdanski."  Reading

12  that second sentence, I'm left with the impression you

13  furnished a copy of Attorney Conopask's letter to

14  Mr. Bogdanski to the Norwich Police; is that true?

15    A.    That is correct.

16    Q.    So a few minutes ago you, when you said you

17  never provided this letter to the Norwich Police, you would

18  have been wrong?

19    A.    That is correct.

20    Q.    That's fine.  I just want to --

21    A.    There's a little more to it.

22    Q.    I understand.  Now, did you, at that time, ever

23  provide a copy of the written no-contact order that you

24  believed existed in the court's files to the Norwich Police

25  Department concerning the July 24th, 2000 incident?

972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

56

1    A.    No.

2    Q.    Okay.  So, again, this is another example where

3 while the Norwich Police -- let me back up.  Do you know if

4 the Norwich Police generated a report as a result of this

5 incident?

6    A.    Absolutely.

7    Q.    And did they investigate this incident?

8    A.    Yes, they did.

9    Q.    And did they speak to you about it?

10   A.    Yes, they did.

11   Q.    Did they speak to Mr. Burchman?

12   A.    Yes, they did.

13   Q.    Did they take a statement from Mr. Burchman?

14   A.    Yes, they did.

15   Q.    Did they investigate by speaking to other people

16 who were at the Pagoda Restaurant?

17   A.    Yes, they did.

18   Q.    Did they take written statements from them?

19   A.    The Chinese people who were there really

20 couldn't speak English that well and didn't understand.

21   Q.    Did you understand my question?

22   A.    Yes.

23   Q.    So when I asked --

24   A.    No.

25   Q.    Let me ask the question again.  The officers

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter

Miaikiewicz & Miller Reporting Services
972 Tolland Stre
East Hartford, CT 06108
(860) 291-9191

1    took statements from people who were employed by the

2    restaurant; isn't that true?

3         A.   Correct.

4         Q.   Okay.  So they did, in fact, investigate this

5    issue, but they did not investigate it sufficiently or as

6    much as you had wanted them to; is that correct?

7         A.   That is correct.

8         Q.   Okay.  That's understandable.

9         A.   That's easy.

10        Q.   And you believed that because the officers

11   didn't believe they could rely on Attorney Conopask's

12   summary of Judge Handy's order that they falsely claimed

13   there was no evidence that Judge Handy had issued such an

14   order; is that correct?

15        A.   They covered it up.

16        Q.   I understand that, and your attorney can have

17   the opportunity to ask you questions about cover-ups and

18   everything else.

19        A.   Okay.

20        Q.   So let me get back to my question, because you

21   make a serious allegation that the Norwich Police were

22   doing false things.

23        A.   Yes.

24        Q.   And I want to uncover the evidence of those

25   things.

972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

58

1    A.    Uh-hmm.

2    Q.    So that's why I ask these kind of narrow

3    questions.

4    A.    Uh-hmm.  Can we go off the record for a second?

5    Q.    No.  In paragraph 12, the last sentence, you

6    allege that the police falsely claimed there was no

7    evidence that the judge had issued such an order, yes or

8    no?

9    A.    Correct.

10    Q.    And isn't it true that the reason for that, that

11    the police didn't believe an order existed, is because they

12    didn't think it was sufficient to rely on Attorney

13    Conopask's summary of that order set forth in her letter,

14    which is Defendant's Exhibit 4; isn't that right?

15    A.    Not true.

16    Q.    Okay.  Why do you believe that -- what evidence

17    do you have that the police falsely claimed that no order

18    had ever been issued by Judge Handy concerning a no-contact

19    order between you and Mr. Bogdanski?

20    A.    Well, I asked that the police call Judge Handy.

21    She lived in Stonington, Connecticut, and she would verify

22    this that night.  They refused to do it.

23    Q.    So you believed the police were obliged to

24    contact Judge Handy at home immediately upon your request

25    to verify this order?

Mixiankiewica & Miller Reporting Services
972 Tolland Street
East Hartford, CT  06108
(860) 291-9191

1      A.    With the problems that had been going on in this

2   case, yes.

3      Q.    Okay.  So do you have any idea how many cases

4   Judge Handy has?

5      A.    Thousands.

6      Q.    You think she can remember every order she

7   issues?

8      A.    This order, yes.

9      Q.    So, anyway, what other evidence do you have that

10  the police falsely claimed that no order existed?

11     A.    I think they conspired with the state's

12  attorney's office, okay, not to do anything or to bring

13  this to the judge's attention.

14     Q.    What evidence do you have that the police

15  conspired with the state's attorney's office?

16     A.    Because they refused to call the judge that

17  night, and I told them what was going on.  This has been a

18  long feud for six --

19     Q.    I understand.  So the evidence of the conspiracy

20  was the officer's refusal to call the judge; is that right?

21     A.    Absolutely.

22     Q.    Do you have any other evidence besides that that

23  evidences the conspiracy between the Norwich Police and the

24  state's attorney's office that falsely claim that the

25  no-contact order existed?

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter

1    A.   The police officer involved, a young woman, I do

2    not remember her name, told me her hands are tied.

3         Q.   And just by saying her hands were tied is

4    evidence of a conspiracy that -- against you?

5         A.   She insinuated that, yes, there was something

6    going on, yes.

7         Q.   And do you have any other evidence other than

8    this vague statement that my hands were tied and the

9    police's refusal to call the judge that night at home?

10        A.   It would have been very easy.

11        Q.   Do you understand my question?

12        A.   No.

13             MR. RADSHAW:  Would you read my question back,

14        please.

15             (Last question was read)

16             MR. MAHONEY:  I will object to the form of that

17        as specifically vague.  If you understand it.

18        Q.   (By Mr. Radshaw) I will rephrase the question.

19   Other than the statement of my hands are tied and the

20   officer's refusal to call Judge Handy at home, do you have

21   any other evidence of this conspiracy between the police

22   and the state's attorney's office to falsely claim that no

23   no-contact order existed between Bogdanski and you?

24        A.   Yes.

25        Q.   Okay.  What evidence is that?

1    A.   What went on in the courtroom with the Attorney

2    Hubert Santos, Judge Handy, and Mr. John Massameno.

3    Q.   Were any members of the Norwich Police

4    Department present?

5    A.   No.

6    Q.   And on what day did this colloquy go on between

7    Attorney Santos, Attorney Massameno, and Judge Handy?

8    A.   I do not remember the date.

9    Q.   And that was after the no-contact order was

10   violated?

11   A.   That is correct.

12        MR. MAHONEY:  Do you need to take a break?

13        THE WITNESS:  I'm fine.  He's not going to wear

14   me down.

15   Q.   (By Mr. Radshaw) Turning to paragraph 13, you

16   allege that July 28th, 2000, you received a threatening

17   phone call from Bogdanski; is that right?

18   A.   That's correct.

19   Q.   Did you have caller ID?

20   A.   No, I didn't.

21   Q.   So the fact that you believe it was Bogdanski is

22   solely based on your perception of his voice; is that

23   correct?

24   A.   That's correct.

25   Q.   And you don't have any documentary evidence that

Nizankiewicz & Miller Reporting Services
972 Tolland Stre
East Hartford, CT 06108
(860) 291-9191

62

1  would establish a telephone call was placed from the

2  Bogdanski residence to your residence at that time, do you?

3      A.   It wasn't a residence.

4      Q.   Where was it?

5      A.   It was my business.

6      Q.   Well then, do you have any evidence, documentary

7  evidence, that a phone call was placed from Bogdanski at

8  some location to you at your business?

9      A.   Yeah, my secretary was sitting there, and I was

10  -- I mean I was very upset.

11      Q.   What is your secretary's name?

12      A.   At that time, I think it was Tracy Sylvester.

13      Q.   Is Tracy still employed by you?

14      A.   No, she's not.

15      Q.   Is she still alive?

16      A.   Yes, she is.

17      Q.   Do you know where she lives?

18      A.   In Norwich.

19      Q.   So who answered the phone?

20      A.   I picked up in the office.  I pick up a lot.

21      Q.   And that's when you received the phone call from

22  the person whom you believe to be Mr. Bogdanski?

23      A.   I thought to believe, yes.

24      Q.   And when you say that your secretary has

25  evidence, she doesn't have any documentary evidence, right?

63

1       A.    No.

2       Q.    So she's just a witness to your exclamation that

3   it's Bogdanski; is that right?

4       A.    That is correct.

5       Q.    But if you were -- it's possible it could have

6   been somebody else?

7       A.    Absolutely.

8       Q.    Okay.  Now, I think I asked you this before, you

9   don't have any particular law enforcement training, do you?

10      A.    No.

11      Q.    You have never been a police officer?

12      A.    No.

13      Q.    Never taken any classes or education about law

14  enforcement?

15      A.    No.

16      Q.    Crime?

17      A.    No.

18      Q.    How about -- have you ever studied law?

19      A.    No.

20      Q.    Never been to law school?

21      A.    No.

22      Q.    Never passed the bar?

23      A.    No.

24      Q.    So what evidence do you have that -- withdraw

25  that question.  You called the police concerning the

Nizziankiewicz & Miller Reporting Services
972 Tolland Str
East Hartford, CT  06108
(860) 291-9191

64

1    threatening telephone call; isn't that right?

2         A.    Yes.

3         Q.    And they came out and investigated it?

4         A.    Yes.

5         Q.    And a report was generated?

6         A.    Yes.

7         Q.    Do you know if the Norwich Police took any other

8    steps?

9         A.    They said they called the telephone company,

10   they really couldn't prove it, and the officer said, look,

11   I went out and Bogdanski supposedly saw me driving down the

12   street and I said it wasn't at that time, and he said there

13   was really too much conflict to the thing and that I really

14   couldn't prove it and there's nothing -- could I prove it

15   was his voice, and I basically said no, so that was really

16   -- he did a good job.

17        Q.    So let's go over that.  So it's your testimony

18   that the police did contact you about the telephone call

19   trying to investigate this --

20        A.    Absolutely.

21        Q.    The mechanics of that?

22        A.    Absolutely.

23        Q.    And the police officer went out to speak to

24   Bogdanski?

25        A.    Absolutely.

Niziankiewicz & Miller Reporting Services
972 Tolland Str
East Hartford, CT  06108
(860) 291-9191

65

```
 1          Q.   And the officer tried to put it together; isn't
 2    that right?
 3          A.   Absolutely.
 4          Q.   And you testified the officer did a good job but
 5    he just couldn't establish it was Bogdanski on the phone;
 6    isn't that right?
 7          A.   That's correct.
 8          Q.   All right.  On August 25th you called the police
 9    because someone left a large rubber penis in your driveway;
10    is that right?
11          A.   I was in court with Judge Santinello in Groton.
12          Q.   Judge Santinello is a great judge.
13          A.   It wasn't court, it was called a referee, okay.
14          Q.   Let's back up.  Who discovered the rubber penis
15    in the driveway?
16          A.   My children.
17          Q.   And do you have any idea when it was that it
18    deposited it there?
19          A.   No.
20          Q.   The reason why you have no idea is because you
21    were at this meeting at some other location with Justice
22    Santinello?
23          A.   That is correct.
24          Q.   And who called the police?
25          A.   My wife.
```

Niz3iankiewicz & Miller Reporting Services
972 Tolland Str(
East Hartford, CT  06108
(860) 291-9191

66

```
 1        Q.   Your wife called the police.  Did the police

 2   respond?

 3        A.   Yes, they did.

 4        Q.   And they conducted an investigation; isn't that

 5   right?

 6        A.   They took the penis away.

 7        Q.   Do you know if they -- sorry.  That sounds

 8   funny.

 9        A.   I'm sorry.

10        Q.   I'm sorry.  I have to ask a bunch of dumb

11   questions.  There's no nonfunny way to say it.

12        A.   He was mortified.  It was awful strange.

13        Q.   The police came out on the call; isn't that

14   right?

15        A.   Yes.

16        Q.   They conducted an investigation by speaking to

17   your wife; isn't that right?

18        A.   And children, yes.

19        Q.   They collected the object that was left there?

20        A.   Yes, they did.

21        Q.   And tagged it as evidence; isn't that right?

22        A.   Yes, they did.

23        Q.   Do you know if they conducted any other

24   investigation or analysis of the object in order to

25   determine who might have left it there?
```

Niziankiewicz & Miller Reporting Services
972 Tolland Str
East Hartford, CT  06108
(860) 291-9191

67

1      A.    They fingerprinted it.

2      Q.    Are you aware if they were able to obtain any

3  readable or comparable fingerprints?

4      A.    They were not.

5      Q.    And isn't it true that neither your wife nor

6  your children saw the person or persons who deposited the

7  object on your driveway?

8      A.    That's correct.

9      Q.    And you're not aware of any witness who saw the

10  object be deposited on your driveway?

11      A.    That's correct.

12      Q.    So now tell me, how do you know that Bogdanski

13  knew you were at this meeting with Justice Santinello?

14      A.    He had this relationship with an investigator by

15  the name of Schroeder who works under the chief state's

16  attorney's office, under Mr. Massameno, and he would follow

17  up on an ongoing basis when I was going to the hearings,

18  when I was --

19      Q.    So you believe Schroeder told Bogdanski?

20      A.    That I was going to a hearing, that is correct.

21      Q.    What evidence do you have that Schroeder told

22  Bogdanski, or Bogdanski asked Schroeder and Schroeder told

23  him?

24      A.    Just from all the things that happened on the

25  same time in the way --

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter

Niziankiewicz & Miller Reporting Services
972 Tolland Street
East Hartford, CT  06108
(860) 291-9191

68

1    Q.   But it's just your belief that he told him;
2  isn't that right?

3    A.   That's correct.

4    Q.   All right.  Because you have no evidence to
5  prove it?

6    A.   No, no.

7    Q.   For example, you weren't present --

8    A.   No.

9    Q.   -- with Bogdanski and Schroeder?

10    A.   No.

11         MR. MAHONEY:  Wait for him to finish.

12    Q.   (By Mr. Radshaw) So when you say in the second
13  sentence of paragraph 14 that the Norwich Police failed to
14  investigate the incident, that's really not true, is it?

15    A.   Well, they didn't find anything.

16    Q.   But they did investigate it, didn't they?

17    A.   They investigated it, but they didn't go around
18  to the neighbors.  They didn't --

19    Q.   So you believe, again, that they did some
20  investigation, but it wasn't a sufficient investigation?

21    A.   That's correct.

22    Q.   Okay.  So if we were to compare what I just --
23  your testimony here that it wasn't a sufficient
24  investigation, that's different than from failing to
25  investigate it at all; isn't that true?

Niziankiewicz & Miller Reporting Services
972 Tolland Stre
East Hartford, CT  06108
(860) 291-9191

113

## CERTIFICATE

1

2      I, Heather A. Pellerin, License #00144, Notary Public

3  for the State of Connecticut and Commonwealth of

4  Massachusetts, do hereby certify that the deposition of

5  DANIEL G. MALCHMAN, was taken before me pursuant to the

6  Federal Rules of Civil Procedure, at the LAW OFFICES OF

7  HOWD & LUDORF, Attorneys for the Defendant, 65 Wethersfield

8  Avenue, Hartford, CT  06114-1190, (860) 249-1361,

9  commencing at 10:00 a.m. on FRIDAY, APRIL 9, 2004.

10      I further certify that the witness was first sworn by

11  me to tell the truth, the whole truth, and nothing but the

12  truth, and was examined by counsel, and his testimony was

13  stenographically reported by me and subsequently

14  transcribed as herein before appears.

15      I further certify that I am not related to the

16  parties hereto or their counsel, and that I am not in

17  any way interested in the events of said cause.

18      Witness my hand this 20th day of April, 2004.

19

20      _Heather A. Pellerin_

21      Heather A. Pellerin, RPR, CRR, Notary

22

23  My Commission expires:        My Commission expires:

24  May 25, 2008 (In MA)          April 30, 2006 (In CT)

25

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter